(No. 37553.— ▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANIEL SLAUGHTER, Plaintiff in Error.

*Opinion filed November 26, 1963.*

JOHN C. AMBROSE, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and RICHARD T. BUCK, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

At the conclusion of a bench trial in the criminal court of Cook County, the defendant, Daniel Slaughter, was found guilty of having murdered his wife and was sentenced to the penitentiary for a term of fourteen years. Maintaining that the homicide was the result of an accidental shoot-

ing, as he has consistently done, defendant prosecutes this writ of error contending that he was not proved guilty beyond a reasonable doubt, that the prosecution failed to prove the necessary element of malice aforethought, and that certain testimony was improperly admitted into evidence.

The defendant, 29 years old, resided with his wife Alice, age 23, and their two small children in a third floor apartment located at 6446 Stony Island Avenue in Chicago. On the night of May 22, 1961, the wife was working as a waitress in a restaurant while defendant, along with his friend Floyd Washington, a taxi driver, was at the apartment with the children. Around 11 :00 P.M. defendant left to pick up his wife at her place of work and Washington went to sleep in the apartment. The latter was awakened when the couple returned home about 1 :00 A.M. and he described them as being happy and cheerful. According to defendant, he and his wife had gone to the apartment of a friend, where defendant had a drink, before returning home. Washington testified that the Slaughters invited him to spend the rest of the night in the apartment if he so desired, but that he declined and departed. The witness said he had some difficulty starting his cab, which was parked in front of the building; that he went back to the apartment and sought defendant's help but was refused; and that when he returned to the street at approximately 1 :15 A.M., he glanced up and saw defendant standing at the window of the apartment. At this time, according to Washington, defendant said something and made a waving motion with his hand.

A 1 :45 .A.M., police officers George Boone and John Jackson, "responded to a call" at the Stony Island Avenue address. The origin of the call does not clearly appear. Upon arriving they heard screams coming from the third floor and, on going up there, knocked on the door and were admitted to the apartment by defendant. The latter, who was crying and smelled of alcohol, had a telephone in his hand and told the officers that he had accidentally shot his

wife and that he had just been calling the police. He directed the officers to a bedroom where they found the lifeless body of the wife lying on a bed, and the top of her head having been blown away. A shotgun with a spent shell in its chamber was found lying in the doorway near the head of the bed, and a live shell was found on the bedroom floor.

The apartment in question was one of six in a building located in a commercial area, and there was open access from the street to the stairs leading to the living quarters. So far as pertinent, the physical facts with respect to the apartment reveal that the front door opened into a living room, and that off the living room were two bedrooms. One bedroom was directly behind the other and it was necessary to walk through the first bedroom to get to the second. The first bedroom was that of defendant and his wife, while the children occupied the second, and defendant told the police that he kept the shotgun behind the head of the bed in the first bedroom, and that he customarily kept two shells in the magazine. It was the testimony of the police officers that the body, the shotgun and the live shell were all found in the second bedroom. Defendant, however, testified that his wife was sitting on the bed in the first bedroom when she was shot.

At the trial the principal witnesses for the prosecution were police officers Boone and Anthony Mayo, and Richard Perry, an 11-year-old nephew of defendant. It was the nephew's testimony that sometime earlier in the month of May, 1961, he had slept overnight in the apartment of his aunt and uncle; that he heard them fighting and arguing on such occasion; that defendant had been drinking; and that he heard defendant say to his wife: "I am going to take something and knock your brains out." Although the witness knew the homicide had occurred on May 23, 1961, he could not recall the exact date of the earlier threat.

Officer Boone, describing an exculpatory statement given by defendant at the apartment, testified that defendant said

he thought he heard a prowler at the front door, as a consequence of which he got his shotgun and went to the door and opened it, but found no one there. Then, as he was returning the gun to his bedroom, and while he was standing in front of his wife, the gun went off. Mayo, who questioned defendant at the station, was given a substantially different explanation by defendant. According to this officer, the defendant said that someone knocked at the door of the apartment and didn't answer when he asked who was there, that he got his shotgun and went to the door and was fooling around with the gun when his wife told him to put it up; and that while he was fooling around with the gun it went off and shot her.

Testifying in his own behalf, defendant gave still a different account of the shooting. He related that shortly after Washington left the apartment, there was a knock on the door and that no one answered when he inquired who it was. At this he looked out the window to see if Washington had departed, and it was his testimony that he saw Washington, who waved to him and "went on." Defendant said the knock on the door was repeated and that when he still got no response to an inquiry as to who was there, he went to his bedroom and got the gun. While this was occurring, he stated, his wife was sitting on the bed in their bedroom. After getting the gun, defendant said he returned to the front door where he again inquired as to who was there and got no response. He said that he did not open the door, but went to put the gun back, and that it discharged as he was approximately six feet from his wife.

When questioned by the court concerning the time and place he had pumped the gun, defendant gave still another version of the shooting in which he said that he had pumped the gun when he picked it up, that a shell ejected onto the bedroom floor, and that the gun had gone off, before he had a chance to get to the front door, as he reached down to pick up the ejected shell. He reiterated this account on re-cross-

examination, and also conceded that he had given testimony at the coroner's inquest to the effect he had gone to the door and that the gun had subsequently discharged as he was putting it away.

The defendant moved for a directed verdict at the close of the People's evidence and we are first met by his contention that it was error to deny such motion. However, as recently pointed out in *People* v. *Washington,* 23 Ill.2d 546, this contention is not available to defendant on review. Having taken the stand and caused other evidence to be introduced in his behalf after the motion was denied, defendant is deemed to have waived his motion for a directed verdict.

Defendant's next contention, *viz.,* that the People did not prove the element of malice aforethought, presents a closer issue. While it is beyond question that malice is an essential element of the crime of murder, and equally certain that it must be proved beyond a reasonable doubt, it is likewise established that malice is implied where no considerable provocation appears or when all of the circumstances of the killing show an abandoned and malignant heart. ( Ill. Rev. Stat. 1959, chap. 38, par. 358; *People* v. *Jordan,* 18 Ill.2d 489.) Hence, malice is implied from any deliberate or cruel act against another, however sudden, and if a person uses a deadly weapon against another, resulting in his death, it may be implied that the killing was malicious. (*People* v. *Marrow,* 403 Ill. 69; *People* v. *Wilson,* 342 Ill. 358.) It is not necessary, to justify a conviction of murder, that the party charged may have brooded over the intent to kill or that he entertained it for any considerable length of time, but it is sufficient if, at the instant of the assault, he intended to kill the person assaulted, or it will be enough if he is actuated in making the assault by that wanton and reckless disregard of human life which denotes malice. (*People* v. *Tillman,* 26 Ill.2d 552; *People* v. *Johnson,* 2 Ill.2d 165.) And while required to be proved beyond a rea-

sonable doubt, malice may be established by circumstantial as well as direct evidence. *People* v. *Shack*, 396 Ill. 285; 21 I.L.P., Homicide, sec. 123.

It is undisputed in this case that defendant shot his wife and, while the claim was made that the shooting was accidental, there was in our opinion sufficient and satisfactory evidence to justify the finding of the trial court that the killing was done with malice aforethought. Prior threats of an accused to do violence to the person eventually slain have consistently been held to be admissible in evidence as showing malice and criminal intent, (*People* v. *Lion*, 10 Ill.2d 208; *People* v. *Griswold*, 405 Ill. 533,) and there is in this record the uncontradicted testimony of the nephew that defendant, but a short time before the shooting, had quarreled with the decedent and threatened to "knock her brains out." Significantly, we believe, it appears that defendant had been drinking when this threat was made and also on the occasion of the killing. Furthermore, we believe that circumstantial evidence of malice is found, first, in the conflicting versions of the "accident" given by defendant to the officers who investigated the shooting and, second, in the utter conflict between defendant's explanations and the physical facts. He told officer Boone that the gun had discharged as he was returning it to its place in his bedroom, yet a short time later he told officer Mayo that the gun discharged as he was fooling around with it after having gone to the front door. But more important, neither version is consistent with the physical facts which show that the body of the decedent and the live shell were found in the second bedroom. Under both versions decedent was supposed to have been sitting on the bed in the first bedroom when the fatal shot was fired, and in neither did defendant's explanation at any time take him into the second bedroom where the ejected live shell was found. Such vacillations are hardly consistent with an honest claim of accident and we believe that defendant, having undertaken to explain and justify the shooting to the

authorities, may be judged by the conflicts and improbabilities in those explanations. Considered in conjunction with the evidence of malice implicit in defendant's prior threat to do violence to his wife, we are satisfied that there was sufficient evidence to establish the element of malice beyond a reasonable doubt.

Similarly, we are of the opinion that the trial court did not err in rejecting the defense that decedent met her death as the result of accident or misadventure. Unless sufficiently manifest from the proof of the People, the burden of proving circumstances justifying, mitigating or excusing a homicide devolves upon the accused in cases such as this where he admits firing the fatal shot, (*People* v. *Sally*, 17 Ill.2d 578; *People* v. *Franklin*, 390 Ill. 108; Ill. Rev. Stat. 1959, chap. 38, par. 373,) and it is the province of the trier of fact, whether it be court or jury, to determine whether such justification or excuse in fact existed. (*People* v. *Washington*, 27 Ill.2d 104; *People* v. *Green*, 23 Ill.2d 584.) In the last analysis the question of whether the shooting was accidental depended upon defendant's credibility, and we believe, as the trial court must have believed, that the utterly conflicting versions of the occurrence he gave from the witness stand, as well as his disputation of the physical facts, rendered his testimony completely unworthy of belief.

Finally, defendant urges that the testimony of Richard Perry concerning the prior threat was inadmissible because there was no foundation to show that it was uttered with a hostile purpose. (See: *People* v. *Scott*, 284 Ill. 465, 474.) Such an objection comes too late when made for the first time on appeal.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*