THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SILAS JAYNE *et al.*, Defendants-Appellants.

First District (1st Division) No. 59168

Opinion filed September 2, 1977.

George C. Howard, Patrick A. Tuite, and Chester Slaughter, all of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Larry L. Thompson, and Renee G. Goldfarb, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BUA delivered the opinion of the court:

Defendants, Julius Barnes, Silas Jayne, and Joseph LaPlaca were indicted for the murder of George Jayne (Ill. Rev. Stat. 1969, ch. 38, par. 9—1) and for conspiracy to commit the murder of George Jayne (Ill. Rev. Stat. 1969, ch. 38, par. 8—2). On April 28, 1973, following a jury trial in the

Circuit Court of Cook County, defendant Barnes was convicted of murder and defendants Jayne and LaPlaca were convicted of conspiracy. No other verdicts were returned by the jury. Defendant Barnes was sentenced to 25 to 35 years imprisonment and defendants Jayne and LaPlaca were each sentenced to 6 to 20 years in the penitentiary. From the judgments of conviction and the sentences thereon, the defendants appeal. No issue is raised regarding the sufficiency of the indictments.

The major issues presented for review, and applicable to all defendants unless otherwise specified, are: (1) whether the guilty verdicts of defendants Jayne and LaPlaca are legally consistent and responsive to the issues at trial; (2) whether the court erred in instructing the jury as to the elements of conspiracy; (3) whether the court erred in denying the motions for severance of defendants Jayne and LaPlace; (4) whether it was error to admit into evidence post-conspiratorial statements by defendant Barnes; (5) whether the court properly denied defendant Barnes' motion to suppress his confession; (6) whether it was error to admit into evidence proof of prior threats made by defendant Jayne; (7) whether the court erred in allowing proof of the *corpus delicti* of the murder and the facts of death from different witnesses; and, whether certain prosecutorial references during examination of witnesses as to the cause and fact of death were so prejudicial as to constitute reversible error; (8) whether the court properly applied *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, and *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, in sustaining prosecution objections to certain questions propounded a State's witness on cross-examination; (9) whether it was error to allow the State to impeach a witness when the witness had previously testified on behalf of the prosecution; (10) whether the trial court improperly admitted into evidence certain expert testimony regarding the growth potential of corn; (11) whether the court erred in denying defendants Jayne and Barnes' section 72 petition (Ill. Rev. Stat. 1969, ch. 110, par. 72) seeking an evidentiary hearing on the issues of the possible use of illegally seized wiretapping evidence against them and on the purported suppression of evidence favorable to them by the prosecution; and, finally, (12) whether defendants Jayne and Barnes were respectively proved guilty of conspiracy and murder beyond a reasonable doubt.

At approximately 8:15 p.m. on October 28, 1970, George Jayne was shot and killed. The incident occurred while the deceased sat in the basement of his home, located in the Inverness section of Palatine, Illinois, playing cards with his wife, Marian, his daughter, Linda Wright, and his son-in-law, Mickey Wright. Earlier in the evening the family had gathered to celebrate George Jayne, Jr.'s 16th birthday.

Officer Michael McDonald of the Palatine Police Department was the first officer to arrive at the scene. Officer McDonald testified that he proceeded to the basement and observed the victim lying on the floor in a pool of blood. He attempted mouth-to-mouth resuscitation and heart massage. Shortly afterwards, a doctor and ambulance arrived and removed the victim from the basement. At this time Officer McDonald observed a bullet hole in a basement window directly above the card table. He "sealed off" the basement and went outside to inspect the area around the window. There he observed footprint impressions in the grass near the window. He secured the area and remained there until help arrived.

Palatine Police Detective Richard J. Sikorski testified that he arrived on the scene at 10:15 p.m. with a third officer. According to Sikorski, they both observed the foot impressions, which, because of their "larger gait," appeared to be those of someone running "back towards the street."

Early the following morning, Timothy Dixon, a criminalist for the State Crime Laboratory, arrived at the Jayne residence. Dixon took photographs of the area, and found fabric impressions and a partial fingerprint in the mud near the window through which George Jayne was shot. However, the fingerprint later proved insufficient to either identify or eliminate the maker.

At trial, the State called Melvin Adams, an accomplice to the murder who had been granted immunity from prosecution. Adams testified that in November 1969, while employed by Darling & Co. in Chicago, he met with Edwin Nefeld at the Hub Restaurant, in Markham, Illinois. Nefeld was an officer of the Markham Police Department and the owner of the South Suburban Auto Shop. During their conversation, Nefeld told Adams that he had been hired to kill a man but that he could not locate him. Believing that Adams had "syndicate connections" Nefeld asked him if he knew any "hit men." Adams replied that he did not know any "hit men," but with further details he might agree to make the "hit" himself. Nefeld told him that it was Silas Jayne who wanted the "hit" made, and he explained who Silas and George Jayne were. Adams agreed to make the "hit" if he could talk to someone first. About one week later Nefeld called Adams to tell him he had arranged a meeting with "Si's man." After meeting at the Hub Restaurant, Nefeld and Adams went to the Flare Restaurant about a mile away. There, Nefeld introduced Adams to defendant Joseph LaPlaca. They discussed the details, including the existence of a feud between the brothers. Before agreeing to take the "hit," Adams requested "front money." LaPlaca told him that because "Si had given front money before to some other guy * * * [who] had run out on him * * *" none would be forthcoming. Adams and LaPlaca then agreed to the sum of $10,000 as a "reasonable price" for killing George

Jayne. (Nefeld subsequently was indicted for conspiracy and pleaded guilty thereto.)

Several days later, Adams met LaPlaca at a prearranged site in Elgin. LaPlaca drove Adams around the area, pointing out places George Jayne frequented. Adams and LaPlaca together made a total of approximately six such trips to familiarize Adams with the area. In February 1970 Adams began making the trips alone.

In either late February or early March 1970, LaPlaca, at Adams' urging, arranged a meeting with Silas Jayne. The meeting took place in the parking lot of the Blue Moon Restaurant in Silas Jayne's car. According to Adams, Silas told him he had had other men on the job, that he had been trying for 10 years to kill his brother, and that there would be two other "hits" after George. Silas also promised that Adams would always be working for him, and that he would provide everything Adams would "* * * need, you know, a string of lawyers, money, anything." At the meeting, Adams suggested George's house as the best location for the killing, and that, if necessary, he would kill any witnesses. Jayne then supplied Adams with a .38 revolver and a .30 Enforcer and two ammunition clips. Jayne told Adams he had filed the serial numbers off of the .38 so that "you don't have to worry about it," but that if Adams used the .30 Enforcer, "make sure you get rid of it" because it could be traced to him.

Thereafter, Adams continued his trips to the Elgin area in search of George Jayne. Occasionally he would meet with LaPlaca. They would discuss the progress being made, and LaPlaca would reimburse Adams for his toll and gas expenses, and collect the receipts for the same. Fearing Adams' car, a 1969 white over red Ford LTD, would be spotted and traced, LaPlaca, on approximately 15 occasions, provided Adams with rental cars from an area dealership.

In April 1970 Adams and LaPlaca decided to travel to out-of-State horse shows in their efforts to locate George Jayne. George and Silas were rivals in the horse show business, wherein horses are trained and presented at shows throughout the country. Witnesses testified at trial that prize money is awarded at the shows, and that there is a lucrative market for championship horses.

Thereafter, Adams and LaPlaca flew to Texas where they observed George at a horse show in San Antonio. Two weeks later, both men drove to New Orleans in Adams' car for another horse show. They registered in a motel, Adams as "Merle Evans" and LaPlaca as "Joe Donato." Adams rented a car in his own name, and they attended the show. Again Adams was unable to make the "hit." LaPlaca flew back to Chicago and Adams drove.

In June 1970 Adams told LaPlaca he wanted to get out of the "hit."

LaPlaca told him Silas would go to $20,000, and Adams continued his search for George.

In July 1970 Adams told LaPlaca the job would require two men. LaPlaca, after checking with Silas, agreed and raised the price to $30,000 for the "hit." Thereafter, for $10,000, Adams recruited defendant Julius Barnes, a fellow employee at Darling & Co., whom he had known for approximately eight years, to make the "hit."

Driving a rental car obtained from LaPlaca, Adams and Barnes made several trips to the Inverness area. On the second trip, after parking near the George Jayne residence and viewing the house, Barnes told Adams they would need a high power rifle. When LaPlaca could not obtain one, Adams mentioned the fact to his girlfriend, Patricia Farmer (later his wife). At trial, Patricia testified that she was able to obtain a .30-06 Savage rifle with a scope from Officer Mike Vest of the Markham Police Department. She knew Vest from her job as a waitress at the Hub Restaurant, and she told him she was going on a hunting trip. She turned the rifle over to Adams in mid-August 1970.

When shown the rifle, Barnes asked Adams whether or not the scope had been "zeroed in" (*i.e.*, aligned on a proper angle with the barrel), which it had not.

Adams subsequently met LaPlaca and Silas Jayne at his farm office. Jayne gave Adams a box of .30-06 shells, and additional ammunition for the .30 Enforcer and the .38 revolver. Adams and LaPlaca then drove to a cornfield which, to Adams, "looked like the back of Si's place," for target practice. Adams testified that the corn looked as if it had been cut down, with stubs standing about two feet high.

Using either a rented car from the local agency or Adams' own car, Barnes and Adams continued their trips to the Inverness area throughout September and October 1970. One night in September, while armed, Barnes and Adams approached the Jayne house. While returning to their car Barnes was attacked by a neighbor's dog, causing him to drop the .38, which they never recovered.

At 5:30 p.m. on October 28, 1970, Adams, driving his car, picked Barnes up at his home on Chicago's south side. They arrived in Inverness at 6:30 or 7 p.m. It was "too light out," so they drove to a coffee shop in Palatine that they had frequented on previous trips.

After finishing their coffee they drove back to the Jayne house and parked the car. Barnes went up to the lawn, stayed about 15 seconds and returned to the car. He said he saw somebody there, and they should drive to the other side of the house. Adams agreed because "some kid went by us on a motorbike * * * and I think he saw us."

At trial, Robert Morris testified that at approximately 8:10 p.m. on

October 28, 1970, while riding his motorbike, he passed an auto parked on Banbury Drive. The car appeared to be red, and Robert noticed a white male with sideburns and glasses inside the car. He said the first three digits of the license plate appeared to be 9, 3, and 6. (Photographs later admitted into evidence show Adams' car license plate to have been 996880.) At the time, Mr. Morris was a high school student and a 13-year resident of Palatine. Also, at about 8:15 p.m., Mrs. Patricia McCoy, a resident of Banbury Road, in Inverness, noticed a car parked on nearby Tweed Street. The car was a red Ford with a white hard top. Although she did not see the driver's face, she noticed that he was a white male, with short, dark, and curly hair.

After pulling around to the other side of the house, Adams raised his auto's hood to avoid any suspicion from passing motorists, and Barnes, armed with the .30-06 rifle, headed for the house. Adams observed Barnes "crouched" near the basement window of the home for six or seven minutes. Barnes brought the rifle to his shoulder several times, and then Adams saw the flash as the gun was fired. Adams observed Barnes return to the car, where Barnes told him "I got him dead center, it looked like he fell over." Adams drove Barnes home and gave him the .30-06 murder weapon and the Enforcer, telling Barnes to "get rid of them."

After dropping Barnes off, Adams drove to Markham, and phoned LaPlaca at 9:45 p.m. to tell him the job was done and make arrangements for the payoff.

Around 4 p.m. on October 29, 1970, Adams met with LaPlaca at the "Stone Shop" (Weidinger Lapidary Supply Store) in Homewood, Illinois. They proceeded to LaPlaca's car, where he paid Adams $15,000 and promised the rest the following day. On October 30, 1970, Adams met Barnes at Darling & Co., and paid him $10,000, and promised that $2,500 more would be forthcoming. That same afternoon Adams and LaPlaca met at the Aurora Holiday Inn. LaPlaca paid the remaining $15,000 and told Adams to get rid of his car and buy a new one as it had been spotted. The following Monday, Adams drove to Barnes' house and paid him the $2,500 he had promised.

During the first week of November 1970, a fellow employee informed Adams that the police were taking pictures of his car. On November 10, 1970, Adams and Pat Farmer were stopped, but not detained, by agents of the Illinois Bureau of Investigation (I.B.I.). Later that day I.B.I. agents again stopped the couple. They asked to see Pat's purse, wherein they found $3,800. This money was confiscated and the two were taken to the Palatine Police Station for questioning about the Jayne murder. They both denied either knowing LaPlaca or having any involvement in the murder. Following their release, Adams turned $10,000 over to James

Shannon, owner of the Hub Restaurant, for safekeeping. Adams subsequently instructed Shannon's girlfriend to turn the money over to an attorney.

On December 3, 1970, police investigators picked up LaPlaca at his home and took him to the sheriff's substation in Niles. There LaPlaca denied knowing Adams. LaPlaca subsequently made the same denials before the grand jury.

Between October 1970 and May 1971, the I.B.I. kept Marian Jayne informed as to the status of its investigation. Through the I.B.I. she made contact with Edwin Nefeld. Nefeld refused to tell her anything about the murder of her husband. On May 17, 1971, accompanied by agent Hamm of the I.B.I., she made contact with Patricia Farmer, who had recently married Adams. The two women talked alone, with Marian Jayne trying to persuade Pat Adams to tell what she knew about the murder. Mrs. Jayne, unknown to the I.B.I., showed Pat $25,000 and intimated that it was hers if she would tell what she knew. Pat said to come back in an hour and talk to Mel. Marian returned and talked to Mel at the Hub for 15 to 20 minutes. He agreed to meet later at his apartment and speak to I.B.I. agents. Later that night the agents, Adams, his attorney, and Marian met and arranged a meeting with the State's Attorney's office the next day to discuss immunity. After returning to the I.B.I. headquarters, Marian phoned Adams who agreed to meet her later that night without his attorney. During their conversation at Mel's apartment, he revealed the details surrounding George Jayne's murder.

On May 19, 1971, having turned "State's witness," Adams phoned Julius Barnes at his home. The call was made from I.B.I. headquarters. The two discussed "Si's" concern over recovering the guns in Barnes' possession. They agreed to meet later that day in the Zayre parking lot across from Darling & Co. Subsequently, the agents placed a transmitter on Adams and he drove to the meeting, which was both observed and recorded by I.B.I. agents. During their conversation, Barnes admitted to Adams, in reference to the killing, that he "aimed for the button, but I got him [George] dead center." Barnes also agreed to perform other "hits" for Silas; asked Adams if Silas could get him a silencer for the next job; admitted kneeling near the basement window in a pair of ribbed trousers he kept in his locker at work; and arranged to turn over the weapons to Adams that night. Thereafter, at 11:45 p.m. Barnes, under surveillance by I.B.I. agents, turned over the weapons to Adams. The agents photographed the events, and the photographs were later admitted into evidence. The agents, however, overheard none of the conversation, as Adams' transmitter had malfunctioned.

At 8 a.m. on May 22, 1971, Barnes was arrested and charged with murder. After being taken to I.B.I. headquarters in Chicago, Barnes was

introduced to Matthew Walsh, who identified himself as an Assistant State's Attorney. Mr. Walsh began questioning Barnes, after first advising the suspect of his rights, and receiving Barnes' acknowledgment that he understood all of his rights. Mr. Walsh testified that Barnes initially denied any involvement in the murder, but admitted possessing the guns at a prior date. Barnes said he had purchased the guns in June, 1969, from a "white boy" on Maxwell Street, but later changed his story, claiming to have obtained the guns from two black boys, one "tall" and one "short." When Mr. Walsh told Barnes that he knew the rifle turned over to Adams had been used in a homicide, Barnes agreed to tell the truth.

Before confessing, Barnes indicated that, if possible, he would like to see Melvin Adams. Adams entered the interrogation room shortly thereafter. According to Mr. Walsh, Barnes asked Adams "What is this all about, what have they got?" To which Adams replied "They know everything." Adams' testimony corroborated Mr. Walsh's on this point. At approximately 12 or 12:30 p.m., Barnes admitted he shot George Jayne, and said he would be willing to make a written statement. A court reporter was summoned, arrived at 2 p.m., and transcribed Barnes' confession. Other than Barnes requesting food, which was provided, there was no conversation between him and Mr. Walsh from the time he consented to make a written statement until the arrival of the court reporter. At trial, Barnes' confession was admitted into evidence without objection by the defendants.

The defense called George Sotos, the owner of the Blue Moon Restaurant. He testified that Silas Jayne was a customer and that during October 1970 the restaurant was being extensively renovated.

Robert Hutchinson testified that on May 17, 1971, he was acting as Mel Adams' attorney. He said that Adams admitted setting up the Jayne murder. Mr. Hutchinson arranged for a meeting on May 19, 1971, with the State's Attorney's office to discuss immunity. He recalled that Adams said Marian Jayne had offered to pay him $25,000 for his help in the case.

Clarence Baumgartner, a farmer who rented the Silas Jayne farm from 1967 to 1971, testified that from August 1970 until the harvest in November 1970 the corn in the field Adams claimed to have taken target practice in was 10 feet high. He said no one could see the tree Adams shot at from where Adams said he stood in the field. Mrs. Baumgartner and her son corroborated this testimony.

Various members of the Jayne family testified that Silas often kept large sums of money around the house. Silas' sister, Mrs. Katherine Miller, said that she saw Silas and George shake hands following a meeting she called in 1967 to promote family harmony.

Connie Barnes, Julius' wife, testified that on October 28, 1970, she worked from 4 p.m. until 12:30 a.m. She said her husband picked her up

as she left work that day. She further testified that she had never spoken to Mel Adams, she had never heard of Silas Jayne or Joseph LaPlaca until the instant trial, she had never seen any weapons around the house, nor had she ever seen her husband with large sums of money during October or November 1970. She did recall, however, that after October 28, 1970, her husband purchased a different car.

Mrs. Leo Frazier, Barnes' sister, testified that on May 20, 1971, her brother gave her $2,000 in $100 bills to keep for him.

Defendant Barnes, testifying on his own behalf, acknowledged knowing Melvin Adams, and he admitted driving to Kankakee with him for target practice. He said he was familiar with guns, but not with the term "zeroing in" a weapon. He testified that on October 30, 1970, Adams, claiming his "life depended on it," gave him some guns for safekeeping. For this, Adams paid him $3,000 and told him not to let his wife see the money. He admitted that a few days later he purchased a used car for $3,150 cash by combining the $3,000 aforesaid with $150 from his October 30 paycheck. Claiming no part in the crime, Barnes testified that he nevertheless admitted the killing because Adams had promised to split $25,000 with him if he did so. Barnes said that at the May 19, 1971, Zayre parking lot meeting Adams told him "somebody is watching." He claimed he said nothing other than "yeah" and "uh-huh" at that time. He said he also knew the police were watching him that night as he gave Adams the guns. He said that at that time, unseen by the police, Adams slipped him the $2,000 he gave to his sister. Barnes said that the police forced him to sign a waiver of his rights and that they refused to let him make a phone call. He said that, during his questioning by Mr. Walsh, Adams came in and said "They don't want me and you, they just want Silas Jayne." He claimed he was told he would be a witness just like Adams. He said that when Adams appeared, he was convinced that Adams had worked out a deal for them and that he would only spend two days in jail for admitting the murder. He ascribed his knowledge of background details incidental to the shooting to the fact that Adams had called him very early on May 18, 1971, and filled him in as to what he should say. On the day of the murder, Barnes said he had worked until 4 p.m., gone to a tavern for a few drinks, arrived home at 7:30 p.m., eaten dinner and watched T.V. At 11:30 p.m., he said he left home to pick up his wife at work.

Defendant Joseph LaPlaca, also testifying on his own behalf, said that Silas Jayne had introduced him to Edwin Nefeld in late February or March, 1970. He said that the reason he later denied knowing Nefeld before the grand jury was because he only knew him as "Ed" at that time. LaPlaca said that he met Nefeld at the Flare Restaurant to discuss painting a horse trailer. At that meeting, Nefeld introduced him to Adams. LaPlaca said he met Adams, who he claimed was looking for a

new car, the next day in Elgin in order to introduce Adams to a friend in the car business. LaPlaca admitted meeting Adams in the Elgin area on other occasions. He also admitted traveling to Houston, New Orleans, and Detroit with him. According to LaPlaca, the Houston and New Orleans trips were made in search of a car dealer friend of Adams from whom they could purchase used cars for resale up North. The Detroit trip was so Adams could help LaPlaca guard Sally Sexton's horses. He admitted paying Adams $100 in two $50 bills he had received from Silas Jayne. LaPlaca also admitted that Adams accompanied him to horse shows in Bloomfield Hills and Oak Brook, but claimed they were both guarding horses at the time. He admitted that he continued to see Adams, and that he would lend Adams money on occasion. LaPlaca said Adams would fix him up with girls, and that he lied to the grand jury about knowing Adams or his wife because "I didn't want to get involved with them girls." He admitted renting cars from the local agency, but said this was because his own car was giving him trouble. He also admitted arranging for Adams to borrow cars on occasion and loaning Adams his own rental car at times. He admitted meeting with Adams at 4 p.m. on October 29, 1970, at the "Stone Shop" (Weidinger Lapidary Store). LaPlaca said that Adams wanted to borrow $500 from him at that time in order to pay for an abortion for his girlfriend. LaPlaca said he refused to lend the money to Adams and had no further contact with him until the trial.

Defendant Silas Jayne testified that following the 1967 family meeting he and George stopped feuding. He said that, because of the nature of the horse business, he kept $3,000 to $6,000 in his money belt, another couple of thousand in his pocket, and $15,000 to $20,000 in both his home and office safes. He identified the .30 Enforcer as one of two such guns he had purchased on February 12, 1969, from Bell's Gun and Sport Shop. He claimed he traded the Enforcer, with its serial number intact, to Nefeld for a .38 police special. He said his gun collection included two .30-06 rifles, and that he bought and maintained ammunition for all his weapons, which he kept at his farm.

The defendants rested. Rebuttal and surrebuttal witnesses were called. Both sides conferred with the court regarding jury instructions, and made closing arguments to the jury. Following entry of judgment on the verdict, the court denied defendants' post trial motions and entered the sentences as aforesaid.

■■ ■ The first issue on review is whether the guilty verdicts of defendants, Jayne and LaPlaca, are legally consistent and responsive to the issues raised at trial. Defendants argue that since Barnes was charged as a co-conspirator and acquitted of that charge by virtue of the jury's failure to return a verdict thereto, but was convicted of murder, the State

failed to prove the requisite element of an overt act by a co-conspirator, as charged in the indictment. We disagree. At the onset we note that Illinois no longer requires logical nor legal consistency of verdicts. (*People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186.) Moreover, the State did prove the overt act of murder, as specified in the indictment, as well as "other overt acts." The essence of conspiracy is an agreement to commit a crime and the offense is complete when the agreement is made, even though no act is done to carry it into effect. (*People v. Beeftink* (1961), 21 Ill. 2d 282, 171 N.E.2d 632.) The purpose of setting forth a specific overt act in the indictment, as against merely pleading the general language of the statute, is to sufficiently inform the accused of the nature of the charge in order to prepare their defense and to serve as a bar to future prosecutions for the same offense. (*People v. Robertson* (1918), 284 Ill. 620, 120 N.E. 539; *People v. Harvey* (1973), 53 Ill. 2d 585, 294 N.E.2d 269; *People v. Gregory* (1974), 59 Ill. 2d 111, 319 N.E.2d 483.) There is no question the indictments returned against defendants Jayne and LaPlaca were sufficient both to inform them of the nature of the charge and to bar any further prosecution for the same offense. We note also that section 8—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 8—2(b)(4)) specifically provides that it shall not be a defense to conspiracy that the person with whom the accused is alleged to have conspired has been acquitted. Therefore, the defendants may not avail themselves of Barnes' acquittal of conspiracy as a basis for reversal of their convictions.

Next the defendants contend that the court erred in instructing the jury as to the elements of conspiracy. They argue that People's Instruction 15 was an improper charge to the jury in that the instruction purportedly expanded the indictment, creating a fatal variance between the pleadings and the proof. We disagree.

■■ People's Instruction 15 was taken verbatim from the Illinois Pattern Jury Instructions, Criminal, No. 6.04, and read to the jury pursuant to Supreme Court Rule 451 (Ill. Rev. Stat. 1975, ch. 110A, par. 451). The validity of IPI Criminal No. 6.04 was upheld by our supreme court in *People v. Heard* (1971), 48 Ill. 2d 356, 270 N.E.2d 18. Neither does the instruction given expand the indictment, creating, as defendants contend, a fatal variance between the pleading and the proof. For a variance to be fatal, it must be of such a character as to mislead the defendant in his defense or expose him to double jeopardy. (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136.) Were we to assume, *arguendo*, the existence of a variance between the crime charged and the proof as created by the giving of the instruction, the record fails to disclose any evidence that the variance was of such a character as to either mislead the defendants in the presentation of their defense or to expose them to double jeopardy. Accordingly, this contention is without merit.

■■ Defendants, Jayne and LaPlaca, contend that the court erred in denying a pretrial motion for severance from defendant Barnes. The motion prayed for severance based upon an expectation of an antagonistic defense if Barnes' confession and his conversation with Adams in the parking lot were allowed into evidence. It is the general rule in Illinois that those jointly indicted should be tried together. (*People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449.) The question of whether one of several persons jointly indicted for a crime should be granted a severance and a separate trial is within the sound discretion of the trial court. (*People v. Connolly* (1965), 33 Ill. 2d 128, 210 N.E.2d 523, *cert. denied* (1966), 384 U.S. 1023, 16 L. Ed. 2d 1027, 86 S. Ct. 1959.) The primary question is whether the defenses of the several defendants are so antagonistic that a fair trial can be assured only by a severance. (*People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809.) The record reflects that the court denied defendant Jayne's motion for severance only after carefully reviewing the statements in issue. The court in determining that the statements did not afford a sufficient basis upon which to grant a severance reserved the right to "take it into consideration at the time there is any effort by the State to offer the statement." The record manifests no abuse of judicial discretion whatsoever in this regard. The record further evinces that Barnes' confession was subsequently admitted into evidence without objection. It is axiomatic that, in the absence of plain error, the failure of a party to object to the admission of evidence operates as a waiver of that issue and precludes consideration of the question on appeal. (*People v. Scott* (1972), 52 Ill. 2d 432, 288 N.E.2d 478.) Thus, notwithstanding the absence of an abuse of judicial discretion in denying the severance, the defendants' subsequent failure to object to the admission of the statement into evidence effectively waives their raising the issue now.

■■ We next address ourselves to defendant Barnes' argument regarding the propriety of the court's admitting into evidence his post-conspiratorial statements and his confession. Barnes contends that it was reversible error for the court to allow the State, during his cross-examination, to read from a written memorandum of an I.B.I. agent who overheard the Zayre parking lot conversation. (We note with interest that the memorandum in question was introduced at trial by the defense as their Exhibit No. 3 for Identification and was used in their attempt to impeach the officer's testimony.) However, we need not decide this issue. The record indicates that the State did not read from the memorandum during Barnes' cross-examination. Rather, the State, without objection, read Barnes the agent's testimony as transcribed earlier at the trial. This is clearly a proper form of impeachment and the contrary is not now argued.

Next, Barnes contends that it was improper to admit his confession into evidence. Specifically, Barnes argues that at the time he confessed he had been denied his right to counsel; that the confession was the result of coercion and was not made voluntarily; that the State failed to take him, without unnecessary delay, before a court for an explanation of his rights and the charges against him; and that the State failed to produce all material witnesses to his confession at the hearing on his motion to suppress.

■■ Pursuant to Barnes' motion to suppress, a hearing was held before the trial judge. The court heard the testimony of three police officers who were present when Barnes was arrested and during his questioning by Assistant State's Attorney Matthew Walsh. The officers testified that they advised the defendant of his rights both at the time of his arrest and again upon their arrival at the station. Mr. Walsh testified that he also advised the defendant of his rights, and that at no time did Barnes request to "see, to speak to, or to consult with a lawyer." Mr. Walsh further testified that all requests Barnes did make, such as for food, were immediately honored by those present. The court then determined that the defendant's confession was voluntary, and denied the motion. The credibility of witnesses at a pretrial hearing, as well as the admissibility of statements, rests within the sound discretion of the trial court. (*People v. Henry* (1976), 37 Ill. App. 3d 813, 347 N.E.2d 447; *People v. Noonan* (1972), 5 Ill. App. 3d 1109, 284 N.E.2d 446.) The trial court's determination that the defendant's statement was made voluntarily will not be set aside by a reviewing court unless it is contrary to the manifest weight of the evidence. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) After carefully reviewing the record, we hold that the trial court's decision as to the voluntariness of the confession is not contrary to the manifest weight of the evidence.

■■ Finally, Barnes argues that the confession should be suppressed because the State failed to produce all material witnesses at the hearing on his motion to suppress. Specifically, the State failed to produce Melvin Adams and Arthur Berg, the court reporter who transcribed the confession. Even assuming, for the sake of argument, that Adams and Berg were material witnesses, no objection to their absence from the proceedings was made in the trial court. The Illinois Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 114—11(d)) provides that "objection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court." Therefore, the State's failure to call material witnesses will not be considered on review, where, as here, an objection has not been made in the trial court. *People v. Henry* (1976), 37 Ill. App. 3d 813, 347 N.E.2d 447.

■■ Defendant Jayne contends that he was prejudiced by the admission into evidence of testimony concerning prior occasions on which he had threatened to kill his brother. At trial, a number of witnesses testified that at various horse shows the defendant, after competing unsuccessfully against George Jayne, had threatened George substantially as follows: "I'll kill you, you son of a bitch." Marian Jayne, Linda Jayne Wright, Ruth Kinnas, Donald Robb and Raymond Winnikates each testified to various occasions on which such threats took place at particular horse shows in the period between 1961 and 1965. The defendant argues that such testimony was improper since no evidence was introduced to reasonably connect the threats to the crimes charged in the present indictments. Specifically, he argues that in light of the evidence that he and George Jayne had reconciled their differences at a family meeting in 1967, evidence of threats prior to but not after the 1967 meeting was highly prejudicial. We find no merit in this argument.

■■ Evidence of the threats was not improper. Prior threats of an accused to do violence to the person eventually slain have consistently been held admissible as showing malice and criminal intent. (*People v. Slaughter* (1963), 29 Ill. 2d 384, 194 N.E.2d 193; *People v. Lion* (1957), 10 Ill. 2d 208, 139 N.E.2d 757; *People v. Griswold* (1950), 405 Ill. 533, 92 N.E.2d 91.) Considerations such as the circumstances under which the alleged threats were made, their repetition, and the lapse of time between them and the killing affect only probative force or weight of such evidence, but not its admissibility. (*Painter v. People* (1893), 147 Ill. 444, 35 N.E. 64.) Moreover, even if such evidence was initially admissible only on the condition that it later be "connected up" there was no error committed. The State did not fail to produce evidence that the defendant's feelings toward his brother had continued into more recent years. In his testimony, Melvin Adams recalled a conversation which took place between himself and defendant Jayne in February or March of 1970, on the subject of the planned "hit":

> "And he [defendant Jayne] says, 'well, what do you think of the job?' I says, 'Well, I came up here, been all over the place,' and, I says, 'I ain't never seen the man.'
>
> And he said, "Well, don't feel bad about that.' He says, 'I've had other men on the job,' he says, 'and they ain't ever seen him, either. He's a hard man to find.' He says, 'I've been trying for ten years and can't get him.' "

Evidence of the threats, then, was not only admissible, but was also tied by credible testimony to the defendant's state of mind and activities shortly before the killing. Finally, even if the evidence of threats was only conditionally admissible and was not properly connected up, the defendant has waived any right to claim error in this respect. Prior to the

introduction of any testimony as to threats made by the defendant, an objection was made that the alleged threats would be too remote in time to be admissible. This objection was overruled. However, the defendant at no time during trial renewed his motion by moving to strike the testimony as to the threats or asking that the jury be instructed to disregard it. He cannot, in any case, then, raise this issue on appeal. *Isenhart v. Seibert* (1955), 6 Ill. App. 2d 220, 127 N.E.2d 469; *Lindsey v. Rosen* (1929), 255 Ill. App. 21, 167 N.E. 89; see generally Annot., 88 A.L.R. 2d 12 (1963).

The cases cited by the defendant are inapposite. Most of them deal with the entirely separate issue of the admissibility of substantive proof of prior crimes. (See, *e.g., People v. Gregory* (1961), 22 Ill. 2d 601, 177 N.E.2d 120; *People v. McDowell* (1918), 284 Ill. 504, 120 N.E.2d 482.) None of the cases cited deals with the admissibility of direct threats made by the accused to the deceased.

Early in the trial, George Jayne, Jr., testified that he was the deceased's son and that he lived in his parents' home. On October 28, 1970, some members of the family were celebrating his birthday at the Jayne home. Present were his mother, his father, his sister Linda and her husband. His other two sisters, Pat and Nancy were away at college. He was upstairs while the others were playing cards in the basement. He heard a loud bang and the sound of running. At his mother's request he called a doctor. Later, he saw his father being carried out of the house in a stretcher, a blanket covering his face. No objection to this testimony was made.

Linda Jayne Wright, the deceased's daughter testified that on the evening in question she was in the basement of the Jayne home playing cards with her mother, her father, and her husband. Suddenly there was an explosion from the window behind her father. He stood up and sank to the floor, bleeding profusely.

Marian Jayne testified over objection that she had four children, two of whom were present on the day of her husband's death. Defense counsel's offer to stipulate that previous testimony as to fact and circumstances of the death was true and accurate was rejected. Mrs. Jayne was then questioned regarding the shooting she had witnessed.

In the course of the prosecutor's closing argument the following transpired:

"There is one thing that occurs to me as I begin talking to you. My time is limited. But the thing that strikes me right away is, I wish George Jayne, the deceased in this case, were here to speak for himself.

Mr. Bailey: I object, please, your Honor.

The Court: Sustained.

Mr. Schreier: There have been things said against him. He has

been referred to as an adulterer, as a horse doper, as a person caused [*sic*] this family feud. And I submit, and that is why I wish he were here to speak for himself.

Mr. Bailey: I object again.

The Court: Sustained.

Mr. Schreier: He is not. We must rely on living witnesses who can be called to testify, whom you can see, whom you can hear talk. That is what we must rely on at this time point."

Defendants Jayne and Barnes contend that this testimony and argument was highly prejudicial in that it unduly emphasized the death of George Jayne and the fact that he left a surviving family. We disagree.

■■■ As regards the death of George Jayne, we note first that a plea of not guilty puts all aspects of the charge in issue and the People may prove their case with any admissible evidence they desire, notwithstanding the defendants' willingness to stipulate to any given fact. (*People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537; *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590; *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.) It was then entirely proper for the State to produce two of the three eyewitnesses to the shooting and a life and death witness. Further, the prosecutor's statements in argument that he wished the deceased could have testified, while not proper were of very minor significance in view of the entire record. Where it appears that such improper remarks do not constitute a material factor in the conviction, or they are of such a minor character that prejudice to the defendant is not their probable result, the verdict will not be disturbed. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Berry* (1960), 18 Ill. 2d 453, 165 N.E.2d 257.

■■■ Turning to the evidence that the deceased was survived by a family we think that much of it was entirely proper. Given the right of the State to prove its case there can be no prejudice to the defendants in the simple fact that the eyewitnesses to the shooting happened to be members of the deceased's family. Nor can it even be argued that these witnesses were called solely for the purpose of proving facts not really contested by the defense, since both testified to other important matters. Also, the State's right to present its full proof of the crime charged includes the right to call a life and death witness who may be a close relative of the deceased. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208; *People v. White* (1973), 10 Ill. App. 3d 914, 295 N.E.2d 300.) Further, we find no impropriety in the references by various witnesses to those family members who were present at the Jayne home when the shooting took place. It is true that evidence in a murder case as to the deceased's surviving family which has no relevance to the guilt or innocence of the accused and yet is presented not incidentally but as if it

was material and proper may be highly prejudicial to the defendant. (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436; *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14; *People v. Heflin* (1976), 40 Ill. App. 3d 635, 351 N.E.2d 594.) But we will not find prejudice in the presentation of evidence or argument concerning the deceased's family to the extent that such mention of the family is necessarily involved in the proper presentation of the State's case. *People v. Parker* (1973), 15 Ill. App. 3d 774, 305 N.E.2d 228; *People v. Thomas* (1968), 93 Ill. App. 2d 77, 235 N.E.2d 298.

■■ Nor do we find the fact that Marian Jayne wept during part of her testimony to be of much significance. In *People v. Wright* the wife of the deceased, testifying as a life and death witness, broke out in tears on the witness stand and had to be removed from the courtroom. The jury was admonished to ignore the emotional reaction. This court held on those facts that the defendant was "in no way prejudiced." (32 Ill. App. 3d 736, 745, 336 N.E.2d 18, 26.) In the present case, Marian Jayne's emotional difficulty did not require the interruption of her testimony. There was no request that the jury be admonished. The defendants were not prejudiced by this incident. See also *People v. Hudson* (1970), 46 Ill. 2d 177, 263 N.E.2d 473; *People v. Hairston* (1973), 10 Ill. App. 3d 678, 294 N.E.2d 748.

■■ Finally, although improper references to the deceased's family, specifically to those family members not present on the day of the shooting, were made, such references do not necessarily require reversal. (*People v. Golson* (1965), 32 Ill. 2d 398, 207 N.E.2d 68; *People v. Jordan* (1967), 38 Ill. 2d 83, 230 N.E.2d 161; *People v. Brown* (1964), 30 Ill. 2d 297, 196 N.E.2d 664.) Under the circumstances we do not think the improper evidence significantly prejudiced the defendants. First, the simple fact that so much evidence concerning the deceased's family was without question properly before the jury, not just by passing reference but in the form of live witnesses and detailed testimony, distinguishes this case in an important way from others in which evidence of the same general nature was found to warrant reversal. We cannot escape the fact that additional mention of the deceased's daughters Nancy and Pat is not unlikely to have had any meaningful impact on the jury. Even if there had not been so much proper evidence of the deceased's family the improper references here would not be sufficient to warrant reversal. These references were not made in such a manner as would suggest to the jury that they were material and proper, but rather were made incidentally, by way of clarifying the full context of the family meeting. No argument was made concerning them. Also, unlike in many of the cases cited by defendants, the jury here did not have before it the issue of whether to impose the death penalty. Further, even though we are aware that any error

committed in the admission of such evidence is not waived by a failure to object at trial (*People v. Bernette*), we think that the defense by its own affirmative conduct effectively waived the right to complain of any error in this respect. The following dialogue took place in the course of the cross-examination of Melvin Adams by F. Lee Bailey, trial counsel of defendant Jayne:

"Q. Did you even bother to inquire how many children would be involved if you had to do in the witnesses, did you ask him that?

A. I asked Si, I think, how many kids there was, and I think he said that there was two daughters and a son, but I don't know, all I know of is one daughter and a son.

\* \* \*

Q. Did you expect if you got into that house with a gun in your hand to meet a family?

\* \* \*

Q. Were you ready to shoot down an innocent woman and her children?

\* \* \*

Q. All right. Now a month or so after you talked to Si is the first time, I take it, you began to be bothered about the notion of having to kill Marian Jayne and the children, right?"

We think it would be strange indeed if we were to permit the defendants to urge that they were prejudiced by the admission of certain evidence after essentially that same evidence was elicited in a direct and calculated manner in an attempt to impeach the State's key witness. Lastly, there is solid authority for the proposition that where there is no doubt as to the sufficiency of the evidence of defendant's guilt any error in the admission of such evidence will not warrant reversal. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7; *People v. Gill* (1973), 54 Ill. 2d 357, 297 N.E.2d 135.) We find that proposition to be fully applicable to the present case.

Defendants, Jayne and Barnes, next assert that the trial court improperly restricted their cross-examination of Melvin Adams. We disagree.

■■ During cross-examination the defense asked Melvin Adams the following question:

"Q. Didn't you tell Edwin Nefeld approximately two days before this murder—."

The State objected on two grounds. First, because the defense had assured the court, in response to the State's pretrial motion in limine, that they would not ask questions of any witness regarding statements made to or by Edwin Nefeld. Secondly, they argued that the question presumed facts not in evidence which they feared could not be substantiated by a subsequent interrogation of Nefeld. The State reasoned that Nefeld, who

had asserted his Fifth Amendment right to remain silent at an earlier bond hearing, might again stand mute if called upon to testify. They contended that the court's remedy of holding Nefeld in contempt would be insufficient to overcome the innuendo implanted in the minds of the jury if the question put to Adams were allowed. The court sustained the objection, counsel rephrased the question, and it was answered without further incident.

In *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, our supreme court condemned the practice of allowing a prosecutor to ask a defense witness patently prejudicial questions, based on facts not in evidence, when the harmful insinuations thereby created were not subsequently supported by the evidence. In *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, the court applied the same standard to the defendant's cross-examination of prosecution witnesses. After a careful examination of the record, we hold that the trial court's ruling is in consonance with Illinois law as expressed in *Nuccio* and *Burbank*. The question was premised on a police report containing the quote of a third party concerning, hypothetically, what Nefeld said that Adams said. The court correctly held this to be "triple hearsay * * * It's Tinkers to Evers to Chance," and an insufficient basis in fact upon which to premise the question.

Since the record manifests that the trial judge specifically held that Nefeld was precluded from asserting his Fifth Amendment rights in the instant case, and since the People waived their right to object to questions subsequently put to Nefeld on grounds that the defense failed to lay a proper foundation with Adams, we see no merit to defendants' claim that the court's ruling hereon limited the availability of Nefeld, improperly extended rights which he could not assert, or effectively barred them from calling Nefeld.

■■ Defendant Jayne further asserts that the trial court denied him equal protection and a fair trial in restricting his closing argument to the jury. Defense counsel sought to argue that Adams had shot the bullets into the trees in the cornfield as aforesaid. This theory was in contradistinction to Jayne's pretrial answer that Nefeld had fired the shots. The right to argue a cause in a criminal case is absolute, though subject to the discretionary power of the trial judge to control, within reasonable limits, how the right shall be enjoyed. (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 275 N.E.2d 210.) We find no abuse of discretion where, as here, the court, at the conclusion of the proof, binds the defense to their answer and bars them from interposing a different theory of defense than that previously pleaded.

The defendants next contend that it was reversible error for the court to allow the State to impeach its own witness.

The State originally called Robert Brown. He testified that he took certain pictures of the various members of the Jayne family, including the victim, at a funeral they attended in 1969. He said he left the pictures at Silas Jayne's stable without seeing him. Subsequently, the defense called Brown during their case-in-chief. On redirect examination he testified that he had previously hesitated answering questions during cross-examination because of prosecutorial threats that "If I in any way flipped my testimony * * * or flipped him [the prosecutor] on the stand * * * he was going to blow a [theft] case that I had pending sky high." On re-cross the State's attorney impeached Brown by showing that Brown's grand jury testimony and his earlier testimony for the State were inconsistent with his defense testimony. Thus, despite the purported threats, Brown had, in fact, "flipped" the prosecutor on the stand. Further, he testified on re-cross that the theft charge had been pending in Ohio and was dismissed prior to his testifying in the instant cause.

■■■ We are in accord with defendant's position that the general, presumptive rule in Illinois is that a party who calls a witness and obtains his testimony on a particular issue cannot thereafter impeach the witness by showing that he is unworthy of belief at least as to that issue. (*People v. Johnson* (1924), 314 Ill. 486, 145 N.E. 703.) However, where, as here, the witness is subsequently called by the opposite party, he may be cross-examined for the purpose of showing he had previously made inconsistent statements. (*People v. Van Dyke* (1953), 414 Ill. 251, 111 N.E.2d 165.) Accordingly, we hold that it was not reversible error for the court to allow the State to impeach Robert Brown.

The defendants further contend that the court erred in admitting expert testimony on the growth potential of corn planted on Silas Jayne's farm. We disagree.

During the course of the trial Melvin Adams had testified that the corn growing in a certain area of Silas Jayne's farm was two feet high. Subsequently, the farmer who worked the area in question, as well as his wife and son, testified for the defense that the corn growth at the time and in the area was approximately 8 to 10 feet tall. Thereafter, in rebuttal, the People called John Stryker and qualified him as an expert in the science of image interpretation of aerial photographs. Image interpretation involves the analysis of aerial photographs to determine the growth potential of vegetation on a particular piece of land. Mr. Stryker, after viewing aerial photographs of the area in question, testified that in his opinion any corn growing in the area would be stunted, unless artificial drainage were used, due to the presence of excess water on the terrain. Stryker's information was based solely on the two photographs he studied, one taken several months before the August 1970 date in question and the other taken eight months afterwards.

██ The court denied the defendants' motion to strike, holding the testimony a proper subject matter for the jury to weigh and evaluate. It is well settled in Illinois that the question of the qualifications of an expert witness rests largely within the sound discretion of the trial court and can only be reviewed on appeal when there has been a clear abuse of that discretion. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) Moreover, Stryker admitted during cross-examination that the testimony of the farmer who planted the land was more reliable than were his opinions based on the aerial photographs. After reviewing the evidence at issue and in light of the diminished value of the testimony because of the witness' admissions, we hold that the trial court did not abuse its discretion in denying the defendants' motion to strike and in allowing the testimony into evidence.

On June 18, 1974, the defendants filed an amended petition pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 72) seeking an evidentiary hearing on questions of alleged prosecutorial misconduct in the suppression of evidence favorable to the defense and the use of illegal wiretaps in the investigation of the case. The State then filed a motion to dismiss the petition. The motion to dismiss was granted. Defendants' appeal from the dismissal is now before us.

Addressing ourselves to the first ground of the petition, the essential allegations of the petition and attached affidavits of Denny Jones and Steven Delaney (an investigator for the defense) are that Mel Adams had attempted to recruit the assistance of Denny Jones in making the "hit," that in the course of doing so, Adams pointed out to Jones in the Hub Restaurant in Markam, Illinois, three men, telling Jones that these men had hired him to kill George Jayne, that Jones, upon being brought to a bond hearing in the matter, viewed defendants Jayne and LaPlaca and informed Assistant State's Attorney Nicholas Motherway and others that neither defendant was among the three men pointed out by Adams, that pursuant to the instructions of I.B.I. agents and Assistant State's Attorneys, Jones refused on a number of occasions prior to and during trial to talk to Delaney regarding the Jayne case, that police reports used in the case failed to mention that Jones had described three men he saw in the restaurant and had indicated that none of these three was Silas Jayne or Joseph LaPlaca, that such reports further incorrectly stated that Jones had indentified Silas Jayne as one of the men Adams pointed out, that as a result of these coverup efforts the defense was unaware of favorable information known to the prosecution until April 1974, when Jones finally consented to talk to Delaney, and that the defense had made a proper pretrial request of the State for any such information.

██ The defendants argue that these allegations, if taken as true, would warrant a new trial under the doctrine of *Brady v. Maryland*

(1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and related cases. We disagree. Viewed in the light of the overwhelming evidence of guilt present in the record as a while, the testimony of Denny Jones would not have been sufficiently likely to affect the outcome of the trial. (See *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *Williams v. People* (1964), 31 Ill. 2d 516, 202 N.E.2d 468.) Further, in order to warrant relief under section 72, the petitioner must not only show that otherwise adequate grounds for relief exists, but that any prejudice he suffered cannot be attributed to any fault or negligence on his own part. (*People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685; *People v. Jennings* (1971), 48 Ill. 2d 295, 269 N.E.2d 474.) It has been held that the failure to call an available witness for fear that he might be hostile is not an excusable mistake so as to permit relief under section 72. (*People v. McArthur* (1936), 283 Ill. App. 467, 194 N.E. 230.) Here, there was no allegation that Denny Jones was unavailable as a witness. The trial court's ruling on a petition under section 72 will be disturbed only where there has been an abuse of discretion. (*People v. Battiste* (1971), 133 Ill. App. 2d 62, 272 N.E.2d 808.) We find no such abuse.

Regarding the second ground of the petition, it is alleged that agents of the I.B.I. illegally tapped the individual telephones of the defendants and that evidence which was the "fruit" of such surveillance was used at trial. In connection with these allegations, copies of four articles from the Chicago Sun-Times newspaper are attached to the petition. These articles, dating from the spring of 1974, discuss the investigation and suspension of a number of I.B.I. agents in the Chicago area resulting from charges by undisclosed "dissident" I.B.I. agents that illegal wiretaps were used in investigating the Jayne case and another case in particular. The most directly relevant statement, repeated in substance in all four of the articles, is that the newspaper was informed by "I.B.I. sources" that wiretaps had been used to gather evidence leading to the indictment and conviction of three persons in the Jayne murder case. No affidavits of persons having firsthand knowledge of the Jayne investigation were present.

We think the court correctly granted the State's motion to dismiss this ground of the petition. A petition under section 72 is the filing of a new civil action. (*People v. Samman* (1951), 408 Ill. 549, 97 N.E.2d 778.) Hence, where the petition fails to state facts sufficient to warrant relief it is subject to a motion to dismiss. (*Glenn v. People* (1956), 9 Ill. 2d 335, 137 N.E.2d 336; *Thompson v. People* (1947), 398 Ill. 366, 75 N.E.2d 767.) While it is true that in ruling on a motion to dismiss a section 72 petition all well-pleaded facts are to be treated as admitted (*Withers v. People* (1961), 23 Ill. 2d 131, 177 N.E.2d 203), this rule does not extend to conclusions drawn by the pleader. (*Kurtzon v. Kurtzon* (1946), 395 Ill. 73,

69 N.E.2d 341.) A petition based on a claim of perjury but not supported by affidavits showing the perjury does not allege facts but merely the conclusions of the pleader based on hearsay matters. (*People v. Touhy* (1947), 397 Ill. 19, 72 N.E.2d 827.) The same is true where the petition is based on allegations of illegal wiretapping. In order to be legally sufficient a request for relief under section 72, based on matters outside the trial record, must be supported by the sworn allegations of the party or parties having personal knowledge of the relevant facts, set forth either by verified petition or by attached affidavit. (*Okumura v. Nisei Boelium Inc.* (1976), 43 Ill. App. 3d 753, 357 N.E.2d 187; *Amerco Field Office v. Onoforio* (1974), 22 Ill. App. 3d 989, 317 N.E.2d 596; and see Ill. Rev. Stat. 1973, ch. 110, par. 72(2).) The newspaper articles produced by the defendants, insofar as they supported the notion that illegally obtained evidence had been used against the defendants, were hearsay in the extreme, or hearsay on hearsay, as were the allegations of the petition itself.

Next, defendants, Jayne and Barnes, contend that they were not proved guilty beyond a reasonable doubt.

 A determination by the jury will not be set aside unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the defendants' guilt. (*People v. Hood* (1974), 59 Ill. 2d 315, 319 N.E.2d 802; *People v. McClindon* (1973), 54 Ill. 2d 546, 310 N.E.2d 290; *People v. Anderson* (1971), 48 Ill. 2d 488, 272 N.E.2d 18.) After reviewing the entire record, we find that the evidence presented was not so improbable as to raise a reasonable doubt of guilt.

Finally, the defendants contend that the trial court committed prejudicial and reversible error in various rulings concerning the admissibility of evidence. After a most careful examination of the record we have determined that the claims of prejudicial error are not supported by the record, that no prejudicial error occurred, and that the claims are meritless.

Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.