**UNITED STATES of America, Plaintiff,**

v.

**Jeff BOYD, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, and Noah Robinson, Defendants.**

**No. 89 CR 908.**

United States District Court, N.D. Illinois, E.D.

March 10, 1992.

Kenneth H. Hanson, Chicago, Ill., for Jeff Boyd.

Victor M. Pilolla, Oak Park, Ill., for Edgar Cooksey.

Eugene C. O'Malley, Chicago, Ill., for Andrew Craig.

Joshua Sachs, Chicago, Ill., for Charles Green.

Michael J. Falconer, Chicago, Ill., for Sammy Knox.

Ronald J. Clark, Chicago, Ill., for Felix Mayes.

Anita Carothers, Chicago, Ill., Robert F. Simone, Philadelphia, Pa., for Noah Robinson.

William R. Hogan, Jr., Asst. U.S. Atty., Chicago, Ill., John Hartman, Asst. U.S.

Atty., Ross Silverman, Asst. U.S. Atty., for U.S.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

We have before us a variety of post-trial motions filed by "Trial I" defendants convicted of serious charges stemming from their involvement in and with the notorious El Rukn street gang. Noah Robinson has filed both a "motion for judgment of acquittal and arrest of judgment pursuant to Rules 29(c) and 34, respectively," and a "motion for a new trial." [1] Sammy Knox has filed a motion to arrest judgment, and also a motion for a new trial. Andrew Craig has submitted a "motion for judgment of acquittal notwithstanding the verdict." Charles Green has filed a motion to arrest judgment, a motion for judgment of acquittal notwithstanding the verdict, and a motion for a new trial. Edgar Cooksey, in addition to filing a motion to adopt certain portions of Robinson's motions, has submitted his own motion for judgment of acquittal pursuant to Rule 29(c), a motion for a new trial, and a motion to arrest judgment. Finally, Jeff Boyd has moved for judgment of acquittal. For the reasons set forth below, we deny all post-trial motions.

## I. ROBINSON'S MOTIONS

### A. Motion for Acquittal, Arrest of Judgment

The standard for review of a post-verdict motion for judgment of acquittal is well-established:

> the test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government ... bear[ing] in

mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences."

*E.g., United States v. Hagan,* 913 F.2d 1278, 1281 (7th Cir.1990) (citations omitted); *see also United States v. Reis,* 906 F.2d 284, 291–92 (7th Cir.1990) (citations omitted); *United States v. Beck,* 615 F.2d 441, 447–48 (7th Cir.1980) (citations omitted).

Such a motion may be granted "only when the relevant evidence is insufficient to prove all the elements of the charged offense." *Beck,* 615 F.2d at 448. Evidence adduced at trial to establish guilt beyond a reasonable doubt is sufficient if *"any* rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *United States v. Colonia,* 870 F.2d 1319, 1326 (7th Cir.1989) (emphasis added) (citing *United States v. Rollins,* 862 F.2d 1282, 1287 (7th Cir.1988), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989)). Put another way, a jury verdict may be overturned only "where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987) (citations omitted).

### 1. Witness Credibility Issues

■ As the government correctly points out, Robinson's "very heavy burden" in the judgment of acquittal context—in which a verdict will be affirmed if *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt—"becomes even heavier" where he is attempting to show insufficient evidence based on the unreliability of witnesses. *United States v. Muskovsky,* 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989).

---

1. Contrary to this court's prior orders, see, *e.g., United States v. Robinson,* No. 89 CR 908 (N.D.Ill. May 3, 1991) (adopting Report and Recommendation of April 19, 1991), Robinson has also filed a series of pro se post-trial motions. As we have previously indicated, pro se motions filed by Robinson and not joined by counsel will be referred to Magistrate Judge W. Thomas Rosemond, Jr. Magistrate Judge Rosemond will address these pro se post-trial motions in due course.

This "heavier" burden stems from the axiom that, "absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir.1989); *see also Muskovsky*, 863 F.2d at 1322.

An "extremely narrow" exception to this general rule permits the trial judge to make credibility determinations where the witness' testimony "contradicts indisputable physical facts or laws," where, in other words, the witness' story is impossible "in the sense that it would violate immutable laws of nature." *Kuzniar*, 881 F.2d at 470–71. Inconsistencies in a witness' testimony do not render that testimony "legally incredible." *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir.1989).

Robinson devotes ten pages of his seventy-one page memorandum to the issue of "incredible witness statements," so unreliable, he contends, that we must enter a judgment of acquittal. His examples, as the government suggests, "fall woefully short of establishing that the testimony of [Henry] Harris, [Jackie] Clay, and [Eugene] Hunter was incredible or unreliable as a matter of law." We discern no violation of immutable laws of nature in Harris' testimony regarding the plot to kill Robert Aulston in Dallas.[2] Nor are indisputable physical facts or laws contradicted in Harris' testimony that Robinson financed the Leroy "Hambone" Barber murder expedition, Harris' testimony that Robinson invested in the El Rukn heroin operation, or in Harris' translations of the gang code.

Likewise, the testimony of Clay and Hunter cannot be termed legally incredible. With respect to Clay in particular, the fact that another federal trial judge, in a subsequent trial, determined that Clay had perjured himself does not require us to disregard his testimony. To paraphrase, a judgment of acquittal "is not required because the government's case includes testimony by 'an array of scoundrels, liars and brigands.'" *United States v. Grandinetti*, 891 F.2d 1302, 1307 (7th Cir.1989) (citations omitted), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990).

### 2. Single vs. Multiple Conspiracies

Robinson argues that the evidence presented at trial "overwhelmingly establishes that there were multiple distinct conspiratorial agreements, numerous distinct conspriracies [sic] as opposed to a single enterprise conspiracy ... as charged by the government." He urges us to employ the "Seventh Circuit *Townsend* Court's example in invoking the conspiratorial paradigm of 'the wheel,' comprised of a group of conspirators playing similar roles—the 'spokes'—each related to the activities of a single 'hub' conspirator or group."

*United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991), is, as the government notes, less helpful to Robinson than he thinks. In *Townsend*, the Seventh Circuit thoroughly analyzed all aspects of conspiracy law, and ultimately affirmed guilty verdicts as to all but one defendant. *Id.* at 1416. The *Kotteakos* wheel/hub/spokes conspiracy analogy was but one of the examples examined by the court. *Id.* at 1391–92.

*Townsend* actually supports the jury finding here that Robinson was involved in a single ongoing conspiracy as charged by the government.[3] A conspiracy may, of

---

2. Robinson offers an affidavit from Aulston to the effect that Aulston did not see a single black person in his hotel during his entire stay. This is supposed to demonstrate that neither Harris nor Derrick Kees (both African–American) saw Aulston in Dallas, as they testified, and, further, is no doubt designed to cast doubt on the validity of the murder plot itself. Credibility evaluations, however, are the jury's province. That the jury chose to believe Harris and Kees' testimony, even though perhaps inconsistent at the fringes, is not one of the "exceptional circumstances" in which we may superimpose our own credibility determination over the jury's.

3. In addition to the actual analysis discussed *infra* in the text of this opinion, *Townsend* involved issues not present here. Most significantly, the trial court in *Townsend* apparently did not give a multiple conspiracy jury instruction, as is required by the Seventh Circuit when the possibility of multiple conspiracies exists. *Townsend*, 924 F.2d at 1410 & n. 14. A multiple conspiracy instruction like the one suggested in *Townsend* was given here, thereby further distinguishing *Townsend* from this case. *See* Trial Transcript ("Tr.") at 8463 ("Even if the evidence in the case shows that a defendant was a member of some conspiracy which is not the conspir-

course, be shown by direct evidence, but also may be shown entirely by circumstantial evidence. *Id.* at 1390. In other words,

> [i]f the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting those defendants of conspiring together. The critical question, then, is whether the jury may reasonably *infer* a single agreement among the defendants....

*Id.* (emphasis in original).

Canvassing relevant cases, and drawing support from a variety of legal and economic literature, the Seventh Circuit demonstrated a strong foundation for a central thesis:

> Conspiracies aren't *necessary* to the commission of crime; a single person can commit a crime without any assistance at all, or with the limited assistance of others who do not know of his goal or who have no stake in the success of his venture. But conspiracies are often *convenient* to the commission of crime, because they yield the benefits of group activity that make it more likely that the crime born of a conspiratorial agreement will actually occur than the crime that is the product of individual effort.

*Id.* at 1395 (emphasis in original). In that same vein, "[c]onspiracies, like all business ventures, are typically distinguished by cooperative relationships between the parties that facilitate achievement of the goal." *Id.* After analyzing the evidence in *Townsend,* the Seventh Circuit found that some defendants had in fact agreed to join the single ongoing conspiracy because their relationship with the "hub" indicated "a substantial degree of cooperation and partnership." *Id.* at 1406. Conversely, some defendants had not agreed to join the single ongoing conspiracy, and the nature of their relationship with the hub was more accurately characterized as "a series of isolated and sporadic transactions." *Id.*

There is no doubt as to which category Robinson belongs. The evidence at trial was clearly sufficient to permit the jury to find that Robinson was a part of a single ongoing conspiracy. There was ample evidence that Robinson's relationship with Jeff Fort and the El Rukns was more than a series of isolated and sporadic transactions. Robinson was significantly involved in the El Rukn heroin and cocaine business. Indeed, evidence adduced at trial fingered Robinson as an important contact and intermediary between Fort and the El Rukns and various drug sources on the east coast. Further, the evidence showed that Robinson invested in and profited from the gang's drug operation. He helped them launder money through a variety of channels, and he used El Rukn hit men on at least two occasions. In short, as the government contends, Robinson's relationship with his co-conspirators does reveal a substantial degree of cooperation and partnership, each conspirator bringing different insidious skills to the mix, each in his own way facilitating the various goals set by the conspiracy.

Determining whether a single or a multiple conspiracy existed is a fact question within the jury's province; "that the government's evidence might also be consistent with an alternate theory is irrelevant," for "the law does not require the government to *disprove* every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond reasonable doubt." *Id.* at 1389 (emphasis in original). Here, the jury found a single conspiracy, and there was ample evidence to support that finding.

### 3. Speedy Trial Concerns

Robinson maintains that his statutory right to a speedy trial was abridged. Federal law establishes the parameters of a defendant's speedy trial rights. Generally speaking,

> [i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an ... indictment with the

---

acy charged in the particular count you are considering, you must find that the defendant—

you must find that defendant not guilty.").

commission of an offense shall commence within seventy days from the filing date (and making public) of the ... indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1) (1988). A person held in custody solely because he is awaiting trial, as Robinson was during part of the period between indictment and trial,[4] is to be tried "not later than ninety days following the beginning of such continuous detention...." *Id.* at § 3164(b).

Robinson was indicted on October 27, 1989, and appeared in court that same day. His trial began on May 6, 1991, some 557 days later. Thus, unless a sufficient number of days are excluded between October 27, 1989 and May 6, 1991, the case against Robinson might have to be dismissed.

The statutory scheme contemplates exclusion of time necessary to file and resolve pretrial motions. 18 U.S.C. § 3161(h)(1)(F); *United States v. Barnes*, 909 F.2d 1059, 1064–65 (7th Cir.1990); *United States v. Montoya*, 827 F.2d 143, 150–54 (7th Cir. 1987). Additionally, an "ends of justice" continuance also acts to exclude days for speedy trial purposes, and such a continuance is explicitly contemplated for unusual or complex cases. 18 U.S.C. §§ 3161(h)(8)(A), (h)(8)(B)(ii).[5] The excluda-

ble time periods in § 3161(h), including §§ 3161(h)(1)(F) and (h)(8)(A), are specifically applicable to a preventatively detained defendant. 18 U.S.C. § 3164(b); *see also United States v. Leon*, 614 F.Supp. 156, 157–58 (W.D.N.Y.1985).

It is unclear whether Robinson would admit that any time was properly excluded. He contends that the Speedy Trial Act was violated "8 to 10 times during the course of this ordeal," suggesting, perhaps, that no excluded days passed before he went to trial.[6] The government maintains that only eleven non-excluded days elapsed.

In Robinson's case, time was in fact excluded under both the pretrial motions and ends of justice clauses. Addressing the pretrial motions exclusions first, we note that § 3161(h)(1)(F) "does not specify the number of days excludable for prompt disposition of pretrial motions." *United States v. Regilio*, 669 F.2d 1169, 1172 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). Indeed, the statutory language clearly excludes "[a]ny period of delay ... resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion[.]" 18 U.S.C. § 3161(h)(1)(F). Moreover, a proposed thirty-day maximum time limit on subsection (h)(1)(F) exclusions was rejected by Congress when it enacted

---

**4.** Robinson was sentenced on December 20, 1990 by United States District Judge George M. Marovich to 72 months in prison for his role in skimming money from Chicago-area Wendy's restaurants. From December 20, 1990 until May 6, 1991, then, Robinson was incarcerated for reasons other than because he was awaiting trial before us.

**5.** 18 U.S.C. § 3161(h)(8)(A) provides that

*Any period of delay* resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the

record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(8)(A) (emphasis added). Subsection (h)(8)(B)(ii) details one of the factors that shall be considered in granting a continuance under (h)(8)(A):

Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

18 U.S.C. § 3161(h)(8)(B)(ii).

**6.** This position is all but factually impossible, since even if Robinson had not been preventatively detained for a portion of the time before trial (and, hence, the seventy day standard applied throughout), an eight-fold violation would mean 560 days were not excluded.

the Speedy Trial Act. *Regilio*, 669 F.2d at 1172 (citing 1974 U.S.Code Cong. & Admin.News 7401, at 7425–26).[7]

■ Here, Robinson (sometimes through his attorneys, sometimes on his own initiative) filed a plethora of pretrial motions; indeed, Robinson is to pretrial motions what McDonald's is to hamburgers. By our count, no fewer than sixty-five (65) such motions (and, additionally, six motions in limine) were filed by or for Robinson. A good number of these pretrial motions—Robinson says twenty-two—related to speedy trial concerns, although that fact is not particularly useful in and of itself. Robinson suggests that those speedy trial motions specifically notified the court that he was "ready, willing and able to proceed with trial," but those motions stopped the Speedy Trial Act clock just as surely as other pretrial motions did. *United States v. Tedesco*, 726 F.2d 1216, 1221 (7th Cir. 1984); *see also United States v. Rogers*, 921 F.2d 975, 983 (10th Cir.) (following *Tedesco*), *cert. denied*, —— U.S. ——, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990); *United States v. Thompson*, 866 F.2d 268, 273 (8th Cir.) (same), *cert. denied*, 493 U.S. 828, 110 S.Ct. 94, 107 L.Ed.2d 59 (1989).

Breaking down Robinson's pretrial motion proclivity on strictly a numerical basis, on average he filed some kind of motion roughly once every eight days between indictment and trial. Some of these motions merited more serious consideration than others, of course, and those that did—including motions for severance and joinder—received extensive attention. In fact, motions attacking the government's initial unwieldy indictment in this case—filed not just by Robinson, but by several defendants—raised significant and serious issues, the scope and profundity of which are extensively addressed in a series of opinions beginning with *United States v. Andrews*, 754 F.Supp. 1161 (N.D.Ill.1990). Robinson cannot argue both that these issues should not have been given the serious attention they deserved, a process that eventually resulted in his severance (with a handful of others) from the bulk of other defendants charged with different offenses, and that his severance and joinder entreaties were not important enough to stop the Speedy Trial Act clock.

■ Moreover, the sheer volume of Robinson's submissions abrogated whatever precedential requirement there might have been to actually rule on those pretrial motions within thirty days. *See United States v. Tibboel*, 753 F.2d 608, 612 (7th Cir.1985). When multiple pretrial motions are filed seriatim, as here, the analogous underlying rationale of § 3161(h)(1)(J) no longer applies,[8] and the court satisfies the Speedy Trial Act requirements if its "disposition" of such motions is "prompt," as § 3161(h)(1)(F) directs. *Id.*

Even if Robinson's many pretrial motions did not act to exclude a sufficient amount of time under § 3161(h)(1)(F) to obviate any speedy trial difficulty, and we find that they do, our order excluding time based on § 3161(h)(8)(A)'s ends of justice provision would do the job. A defendant contesting such an exclusion has a heavy burden, for "the decision to grant a continuance under the Speedy Trial Act, and [the] accompanying decision to exclude the delay under [§ 3161](h)(8)(A) is addressed to the discretion of the trial court. To obtain a reversal of the court's decision a defendant must show actual prejudice." *United States v.*

---

**7.** *But see infra* note 7 and accompanying text discussing *United States v. Tibboel*, 753 F.2d 608 (7th Cir.1985) (thirty-day limit on pretrial motion delay appropriate in some instances, especially where defendant files only one pretrial motion); *see also United States v. Janik*, 723 F.2d 537, 543–44 (7th Cir.1983).

**8.** That section of the Act reads as follows: "(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C.

§ 3161(h)(1)(J). Section (h)(1)(F), specifically directed to pretrial motions, contains no such explicit time limitation, instead counseling the "prompt disposition" of such motions. The Seventh Circuit generally reads § (h)(1)(F) in conjunction with § (h)(1)(J), however, in order to avoid "the paradox that the court must act on any submission within 30 days except a pretrial motion, which the court could take all the time it wanted to decide, provided it could be said to have acted promptly." *Tibboel*, 753 F.2d at 611.

*Blandina,* 895 F.2d 293, 296 (7th Cir.1989) (citations omitted; bracketed language in *Blandina* ).[9]

■ Robinson contends that, because we never "set forth, either orally or in writing," our reasons for granting an ends of justice continuance, any order purportedly based on § 3161(h)(8)(A) is invalid. This argument must fail. The Seventh Circuit has clearly held that "the required findings need not be entered at the same time as the grant of the continuance...." *Janik,* 723 F.2d at 544 (citing *United States v. Brooks,* 697 F.2d 517, 522 (3d Cir.1982), *cert. denied,* 460 U.S. 1071, 103 S.Ct. 1526, 75 L.Ed.2d 949, *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983)).[10] The Speedy Trial Act "does not specify when the court's findings must be recorded, and the purposes of this statute are satisfied by a subsequent articulation. The judge's later [explanation] ... create[s] a record for review and ... demonstrate[s] that he has given the matter the careful consideration which the Act requires." *Brooks,* 697 F.2d at 522.

Here, the initial order excluding time under § (h)(8)(A)—and specifically § (h)(8)(B)(ii), the "unusual" or "complex" case justification—was docketed on January 16, 1990. While that minute order is terse,[11] a subsequent detailed explanation was docketed on June 14, 1990. In that lengthier order, we reiterated earlier concerns about the complexity of the case, the number of defendants indicted, the scope of time involved, and the massive number of predicate acts charged in connection with the RICO counts. We specifically found that "[t]here are 38 defendants charged in th[e] 175 count indictment, which spans a 24 year period involving an alleged 128 acts of racketeering, including numerous murders and an extensive and complex narcotics conspiracy." *United States v. Andrews,* No. 89 CR 908, slip op. at 2 (N.D.Ill. June 13, 1990).

It is true that the subsequent order was specifically directed at the exclusion of time between November 9, 1989 and December 12, 1989, and that the one sentence minute order excluded time between January 16, 1990 and "such time [as] the case is ready for trial." Both orders, however, dealt with subsection (h)(8)(B)(ii), thus putting each defendant on notice as to the rationale for our ends of justice exclusions. The indictment, after all, did not become less complex with the passage of time— more than three dozen defendants were still charged with scores of illegal acts over a nearly 25–year period. Additionally, just to be clear, our detailed explanation was issued in June 1990, subsequent to the January 1990 subsection (h)(8)(B)(ii) minute order. That it was ostensibly directed at a period of time prior to the January 1990 minute order is irrelevant for purposes of setting forth in writing the reasons for granting such a continuance. The justification for the November–December 1989 exclusion of time was the same justification, based on the same sections of the Speedy Trial Act, for the exclusion of time beginning in January 1990.

---

**9.** Robinson has made no showing that delay prejudiced him "in the manner meant by the term in this context"; a defendant is prejudiced when "delay [is] intended to hamper defendant's ability to present his defense." *Tedesco,* 726 F.2d at 1221. Indeed, the continuances here arguably benefitted Robinson. Sorting out the severance and joinder issues "essential to preserv[ing] individual rights in a specific, complex multi-defendant proceeding" did not prejudice Robinson, and the time necessary to do so was properly excludable; a contrary finding might pervert the Speedy Trial Act's protections for those defendants like Robinson who seek severance. *Cf. United States v. Vega,* 860 F.2d 779, 786–87 (7th Cir.1988) (finding severance motion exclusions not violative of 18 U.S.C. § 3161(h)(8)(C), which prohibits exclusions based upon the "general congestion of the court's calendar").

**10.** We recognize, of course, the Seventh Circuit's warning that an ends of justice continuation may come too late where "the judge gives no indication that a continuance was granted upon a balancing of the factors specified by the Speedy Trial Act...." *Janik,* 723 F.2d at 544. As explained *infra,* not only was an initial indication given here (and even an explicit reference to the section of the Act relied upon), but a more detailed explanation was later issued.

**11.** In pertinent part, the order reads: "The Court finds that an excludable delay be entered pursuant to 18:3161(h)(8)(B)(ii) to run until such time the case is ready for trial."

There can be no doubt that this was an extraordinary case. As we have already alluded, the sheer volume of evidence amassed by the government, including a daunting collection of hundreds of wire-tap conversations, made pretrial preparation—especially for defense counsel—exceptionally difficult and time consuming. This task became gargantuan for the four defense counsel that were appointed "midstream" to replace the originally appointed Federal Defender panel attorneys for Cooksey, Craig, Knox, and Green. Additionally, the process by which the government and defense counsel confronted and dealt with the pretrial investigation and discovery was not straightforward, and took some not insignificant negotiation. Finally, as with all multi-defendant cases, there are significant scheduling circumstances that have to be addressed. The schedules of busy prosecutors and defense attorneys certainly do not take precedence over a defendant's speedy trial rights, but neither should they be ignored. These factors underscore the legitimacy of the excluded time.

■ We do find Robinson's argument relating to the *nunc pro tunc* nature of the ends of justice continuation persuasive, which is why we have referred to the docketed date of the subsection (h)(8)(B)(ii) orders. Specifically, the January 16, 1990 order purports to exclude time *nunc pro tunc* (literally, "now for then") beginning December 15, 1989. This is in contravention of established Seventh Circuit principles, as Robinson correctly points out. *See Tibboel*, 753 F.2d at 611 (Speedy Trial Act "does not permit retroactive continuances"); *Janik*, 723 F.2d at 545. However, this is an academic victory rather than a substantive one for Robinson, because, as we have explained above, the time between December 15, 1989 and January 16, 1990 was excludable anyway under subsection (h)(1)(F). *Cf. Tibboel*, 753 F.2d at 611 (error in excluding time retroactively was harmless since time "was excludable anyway").

As for the suggestion that the January 16, 1990 order excluding time until trial was impermissibly open-ended, see *United States v. LoFranco*, 818 F.2d 276, 277 (2d Cir.1987), there can be little doubt that the subsection (h)(8)(B)(ii) exclusion we entered here was "reasonably related to the actual needs of the case...." *Id.* at 277. *LoFranco*'s dicta is no stronger than a reminder to district court judges that the complex case exclusion should not be used "either as a calendar control device or as a means of circumventing the requirements of the Speedy Trial Act." *Id.; see also United States v. Beech–Nut Nutrition Corp.*, 677 F.Supp. 117, 123 (E.D.N.Y.1987) (noting *LoFranco*'s limited usefulness; finding exclusion justified by case's complexity). While we need not downplay the extent to which the government's posture in this case pushed the speedy trial envelope, necessitating the court's continual reminder to prosecutors of the defendants' rights, those reminders are most accurately seen as evidence of the court's awareness of and concern for the defendants' situation rather than as an indication that the government had already crossed the line. Had severed Trial I not begun May 6, 1991 as scheduled, Robinson's speedy trial claims would be quite a bit stronger, but because it did (notwithstanding the government's protestations), the ends of justice continuance entered in January 1990 did contemplate a "particular trial date," *LoFranco*, 818 F.2d at 277, and was therefore valid on that basis.[12]

Accordingly, Robinson's speedy trial arguments are rejected. We find that much fewer even than seventy days actually ran for Speedy Trial Act purposes; the pretrial motion and ends of justice exclusions acted to stop the clock on the vast majority of days that actually passed between indictment and trial.

### 4. Narcotics Conspiracy

■ Robinson contends that, at most, the evidence presented by the government at trial showed that he had introduced will-

---

**12.** In actuality, the longstanding trial date was January 2, 1991. That date was set back until May 6, 1991 for a variety of reasons, not the least of which was the need for new defense counsel to have sufficient time to prepare for an extremely complex trial. *See supra.*

ing narcotics purchasers to willing narcotics sellers, and that a buyer-seller relationship is by law insufficient to support a conspiracy conviction. While Robinson's recitation of the law is correct, *e.g., Townsend*, 924 F.2d at 1016, there was evidence that Robinson's relationship to the El Rukn drug apparatus went far beyond the buyer-seller realm. Indeed, *Townsend* teaches that, if there is "any prior or contemporaneous understanding beyond the mere sales agreement," a conspiracy may be present. Where, as here, there was evidence of a " 'partnership in criminal purposes,' " *id.* at 1395 (quoting *United States v. Kissel*, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910)), and evidence that demonstrated " 'informed and interested cooperation,' " *id.* (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943)), the jury could reasonably have found Robinson guilty of narcotics conspiracy. As the government notes, it offered evidence showing that Robinson located willing drug dealers, and "participating in, invested in, and profited directly from the El Rukns' narcotics activities."

To the extent that Robinson's argument that his narcotics conspiracy conviction must be set aside as based on the unreliable or inconsistent testimony of the government's witness(es), those concerns were addressed by the jury. Moreover, as discussed above in §§ I(A) and I(A)(1), there has been no showing that the testimony was legally incredible, and we therefore do not discount the jury's credibility determinations.

### 5. Juror Anonymity

■ Robinson next suggests that he was prejudiced by the juror selection and identification process. Jurors were selected anonymously, and referred to by their juror numbers. Robinson's complete argument is that

> [a]n anonymous jury has the inherent prejudice created in the jurors' minds by virtue of the abnormal method of selection. The jurors in this case were assigned numbers to assure anonymity. The clear implication being the need to protect their identities from the defendants.
>
> However, the anonymity label is a misnomer because the government, or minimally, agencies of the government, i.e., jury commissioner/supervisor, marshalls [sic], FBI, etc., most certainly know who the jurors are. The defendant has no comparable access to juror information.

Motion at 48.

This argument is not persuasive. The "use of an anonymous jury is not violative" of Robinson's constitutional rights "if there is a 'strong reason to believe the jury needs protection' and 'reasonable precautions are taken to minimize the effect that such a decision might have on the jurors' opinions of' " Robinson. *See United States v. Infelise*, 1991 U.S.Dist. LEXIS 16,371, at *3 (N.D.Ill. Sept. 16, 1991). Here, the jurors had no reason to believe that special procedures were being used,[13] and therefore no reason to link those procedures to their opinion about Robinson or other defendants. *Id.* at *9 (" 'anonymity of a jury is not intrinsically suggestive,' especially for those who have never served on a jury before, and therefore do not have any basis for comparison") (citation omitted).

The contention that "minimally, agencies of the government" had access to the jurors' names is irrelevant. Judicial branch—that is, the court and its staff—

---

**13.** In the presence of the entire panel of prospective jurors, and just prior to questioning the first group of eighteen, we downplayed any significance that might have been attached to the anonymous selection process in the following introductory statement:

> I will be asking you questions on behalf of all the lawyers about your background. We are not going to ask you specifics—we're not going to ask you for your name, we're not going to ask you for your address, or the name of your employer, or anything like that. We're just going to ask some general questions about your background to make sure that we give both sides a fair trial in this case. Don't feel that these questions are an attempt to pry into your personal lives; as I said, these questions are on behalf of all the parties in this case, and me, to make sure that both sides get a fair trial.

Recorded Jury Selection Proceedings, *United States v. Andrews*, No. 89 CR 908 (May 6, 1991).

personnel had access to the names, but the executive branch—*i.e.,* the U.S. Attorney's office—did not. Obviously, this is a fundamental distinction. Therefore, the assistant U.S. attorneys prosecuting Robinson had no "advantage" because they had no access to the names.

In short, our decision to use anonymous jurors was based on our concurrence with the government's demonstration that such a tactic was advisable, and that decision did not violate any of the defendants' rights, constitutional or otherwise, because reasonable precautions were taken to downplay the significance of using the juror's numbers instead of their names. Robinson was not prejudiced by the use of the anonymous jury.

### 6. Attorney–Client Privilege

■ Robinson argues that his former attorney in this case, Adam Bourgeois, Sr., somehow acting at the behest of the government, violated the attorney-client privilege by giving the government copies of letters received from Robinson in 1990. This contention is fundamentally flawed in several respects.

First, as the government suggests (without authority), the five letters in question—all between Robinson and Robert Aulston, from October 22, 1985 through November 12, 1985—may not even be privileged. *See Fisher v. United States,* 425 U.S. 391, 404, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) (attorney-client privilege protects only those disclosures "necessary to obtain informed legal advice" which might not have been made absent the privilege; "pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice"). Bourgeois represented Robinson in this case from October 27, 1989 until February 15, 1991; under *Fisher,* the Aulston letters in question may well have been pre-existing documents.

That issue is academic, however, given that Robinson's central claim here is false. He maintains that Bourgeois turned the letters over to the government, when in fact the government actually received the letters from two sources—Alan Brothers and Donald Colleton. Brothers replaced Bourgeois as Aulston and William Goodall's attorney in an earlier civil lawsuit against Robinson, and Colleton was Robinson's lawyer in that civil suit.

According to the government, both Aulston and Goodall referred prosecutors to their attorneys when questioned about documents relating to their civil action against Robinson. Response at 10 (Aulston and Goodall "indicated that the government should feel free to get the case file from whichever one of their attorneys had it").[14] Bourgeois told prosecutors that he had given the file to Brothers in 1986. Pursuant to subpoena, Brothers produced what he said was the case file from the civil suit.

The government also subpoenaed all nonprivileged materials from that suit from Colleton, Robinson's civil attorney. Colleton told prosecutors that he would first give Robinson's defense attorneys a chance to review the file in order to ascertain whether a privilege should be asserted as to any documents. According to the government, Colleton told prosecutors that, "before he provided any records, Anita Rivkin–Carothers ... came to his office and reviewed the case file. According to Colleton, [Rivkin–]Carothers asserted a privilege as to certain documents which were then pulled from the file." Response at 11. The rest of the file was then produced to the government.

Brothers and Colleton both produced the letters in question—and Rivkin–Carothers, the attorney who filed both of Robinson's post-trial motions, appears to have personally reviewed the Colleton materials prior to any such production. There has been no intrusion into matters protected by the attorney-client privilege as that privilege relates to Robinson and Bourgeois.

**14.** Both Aulston and Goodall deny that they gave the government permission to get the case file, a fact that may be interesting in other contexts, but is irrelevant to Robinson's argument here.

### 7. Severance

■ Robinson contends that he should have been severed from the indictment and tried separately. To the extent that this argument presses the single versus multiple conspiracy point broached *supra*, it is unavailing for the reasons set forth in § I(A)(2). To the extent that Robinson alleges prejudicial spillover, we note that Robinson was not tried together with all of the defendants available for trial. We ordered the severance of the indictment in this case into more manageable segments, and the resulting severance plan—which, of necessity, entailed the balancing of many significant considerations, including prejudicial spillover—did not provide for a separate trial for any one defendant. Indeed, as Robinson admits, "there is a strong interest in joint trials of those engaged in a common enterprise." *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987).[15] Denial of Robinson's motion for severance does not provide support now for his motion for acquittal.

### 8. Rule 402 and 403 Concerns

■ Listing four examples, Robinson maintains "[i]rrelevant evidence in violation of FRE Rule 402 and unfairly prejudicial relevant evidence in violation of FRE Rule 403 ... was presented before the jury." Robinson does not, however, explain just how or why this evidence was either irrelevant or unfairly prejudicial, and we find no justification for his argument.

The Coleman murder evidence was the foundation for the charges relating to the kidnapping of the government's witness to the murder, Patricia McKinley. Sammy Knox and Jeff Boyd were charged with the kidnapping in the indictment. This evidence, and especially evidence pertaining to Robinson's other three examples—the "uncharged murders," the LAW rocket incident, and the seized weaponry—was in fact circumscribed by the court; in these and other situations the government could have offered significantly more evidence, but we did not allow it to do so. The evidence that we did permit was necessary; for instance, the abbreviated LAW rocket evidence tended to show Robinson's motivation for offering Henry Harris money to give a false deposition, as well as other issues.

Robinson's Rule 402 and 403 argument does not warrant granting his motion for acquittal.

### 9. Transcript Admissibility

■ Robinson seems to argue that he was "prejudiced by the Court allowing into evidence the tape recorded conversations of other individuals," including conversations "about but not involving Robinson...." Motion at 67–68 (emphasis removed). At root, the argument is a challenge to Federal Rule of Evidence 801(d)(2)(E), which permits admission into evidence of "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E).

Exactly the same situation arose in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). There, the Supreme Court affirmed the trial judge's admission (over petitioner's objection) into evidence of tape-recorded telephone calls between an FBI informant and a drug purchaser; during the taped conversation, the purchaser spoke of a "gentleman friend"—the petitioner—who had some questions for the informant/seller.

---

**15.** The important factors weighing in favor of a joint trial are among those factors we considered in whittling away at the original indictment to create more manageable trial segments. "More manageable," of course, does not necessarily mean individual trials for, in this case, the two dozen or so defendants available for trial. There are important advantages in trying defendants together:

> Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the

> claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one of the other (or both) undoubtedly committed a crime. The joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.

*Buljubasic*, 808 F.2d at 1263.

*Id.* at 173, 184, 107 S.Ct. at 2778, 2783. The admissibility of these co-conspirator statements under Rule 801(d)(2)(E) requires a judicial finding by a preponderance of the evidence that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Id.* at 175, 107 S.Ct. at 2778; *see also* Fed.R.Evid. 104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.").

Petitioner's argument, similar to Robinson's here, was that a co-conspirator's statements are unreliable and inadmissible, "at least until a conspiracy is shown," but because they are unreliable, the statements "should not form any part of the basis for establishing a conspiracy, the very antecedent that renders them admissible." *Id.* at 181, 107 S.Ct. at 2781. The Court found two holes in that argument: (1) "out-of-court statements are only *presumed* unreliable. The presumption may be rebutted by appropriate proof"; [16] and (2) "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Id.* at 179–80, 107 S.Ct. at 2781 (emphasis in original).

In short, we may examine the statements sought to be admitted in making our Rule 801(d)(2)(E) factual determinations; thus, we could properly consider the statements offered by the government—even those "about but not involving Robinson"—in finding that the government had established by a preponderance of the evidence that the declarants were involved in a conspiracy with Robinson. *Id.* at 181, 107 S.Ct. at 2781–82. The evidence presented by the government clearly established the existence of a single conspiracy and Robinson's participation in that conspiracy.[17]

Therefore, the tape-recorded conversations objected to by Robinson were admissible under Rule 801(d)(2)(E), and we find no justification here for Robinson's motion for acquittal.[18]

### 10. Jury Instructions

■ Finally, Robinson asserts that we should have given his proposed "theory of defense" jury instructions, and that our failure to do so denied him due process and the right to a fair and impartial trial. It is axiomatic that a "'defendant is not necessarily entitled to have his or her particular instruction presented to the jury....'" *United States v. Briscoe*, 896 F.2d 1476, 1512 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Additionally, the Seventh Circuit, in determining whether a trial court erred in refusing to tender a particular instruction,

> [will] examine the jury charge as a whole, rather than focus on isolated passages. Moreover, because "'a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence and instruction of the jury by the judge,'" we review the instructions in the context of the overall trial and the arguments by counsel.

*Id.* (citations omitted).

We found Robinson's "theory of defense" instructions (which we, like the government, assume to be proposed instructions 52–66) inappropriate, in part because they contained misstatements of fact and law, in part because they were unsupported by the evidence, and (though not necessarily our only other consideration) in part because their exclusion did not deny Robinson a fair trial. *See Briscoe*, 896 F.2d at 1512 (citing four *Douglas* factors).

---

**16.** Curiously, Robinson "quotes" this passage from *Bourjaily* as "'[a] co-conspirator's out-of-court statement is presumed to be unreliable, but this presumption may be rebutted "by appropriate proof."'" Motion at 65 (purportedly quoting *Bourjaily*).

**17.** Again, the alleged unreliability of the government witnesses' testimonies is an insufficient ground for granting the motion for acquittal,

absent some showing of legal incredibility. *See supra* § I(A)(1).

**18.** Robinson offhandedly makes a Sixth Amendment confrontation clause objection. Motion at 68. *Bourjaily* is clear that admission of a co-conspirator's statements under Rule 801(d)(2)(E) does not violate the Sixth Amendment, or any right to confront witnesses. *Bourjaily*, 483 U.S. at 181–84, 107 S.Ct. at 2782–83.

We also note that Robinson did not submit revised instructions after his initial offerings were rejected. Given all of these considerations, we find that he suffered no prejudice warranting the grant of his motion for acquittal. The motion is denied.

### B. Motion for New Trial

The trial court's power to grant or deny a motion for a new trial is discretionary, and will be overturned on appeal only if there has been " 'an error as a matter of law or a clear and manifest abuse of discretion.' " *United States v. Reed*, 875 F.2d 107, 113 (7th Cir.1989); *see also United States v. Morales*, 902 F.2d 604, 605 ("standard of appellate review ... a highly deferential one"), *amended*, 910 F.2d 467 (7th Cir.1990).

> To be sure, our discretion has limits: The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.... The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.... Motions for new trial based on weight of the evidence are not favored. Court are to grant them sparingly and with caution, doing so only in those really "exceptional cases."

*Id.* (citations omitted). In that same vein, a new trial is "not to be granted lightly," since jury verdicts in criminal cases may not "be overturned lightly." *Morales*, 902 F.2d at 605. Of course, "if the judge believes there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he has the power to set the verdict aside...." *Id.* at 606.

The bulk of Robinson's motion for a new trial is nothing more than an attempt to get us to "reweigh the evidence." This is notwithstanding the reality that we are not at liberty to do so even if we feel that "some other result"—in this case, a not guilty verdict—"would be more reasonable," a feeling we do not have here anyway. We have addressed Robinson's primary arguments regarding witness credibility, the narcotics conspiracy issue, and Rule 801(d)(2)(E) as those contentions surfaced in his motion for acquittal, and see no reason to repeat ourselves. We agree with the government, in short, that "the evidence of Robinson's guilt for each of the offenses charged in the indictment was overwhelming, and this is not an 'exceptional case' such that it would be a miscarriage of justice to let the verdict stand." Response at 17.

Robinson also lists thirty "additional grounds" for a new trial. Only five of these grounds merit even a brief specific response. The other twenty-three have either been ruled on previously, some even in the context of the motion for acquittal (¶¶ C, E, F, H, J–L, P, U, W), or are so general as to be meaningless. *See, e.g.*, ¶ O ("The Court erred in sustaining various evidentiary objections of the Defendant, which appear in the record.").

We did not err (as argued in ¶ I) in permitting limited evidence of Robinson's "skimming case," which resulted in his conviction before Judge Marovich, to be introduced by the government. A limited reference was appropriate to suggest a connection to Robinson's plan to have El Rukn hit men murder Robert Aulston, Robinson's partner in the restaurant operation. There was no error (see ¶ T) regarding Morton and O'Callaghan's testimony as to certain conversations with Jake Oliver. As the government points out, O'Callaghan did not testify regarding the substance of conversations with Oliver, and Morton's testimony was stricken after an objection.

Paragraphs Y and Z of Robinson's laundry list suggest court error in not declaring a mistrial after defendants Edgar Cooksey and Andrew Craig briefly disrupted the trial during the government's closing argument. Cooksey and Craig felt it necessary to themselves object to the prosecutor's argument, and then to accuse the court of not fairly sustaining defense objections. There was no error here, and no prejudice to Robinson warranting a new trial; we promptly recessed for several minutes, admonished the jury after it returned from

the break,[19] and permitted the government to finish the last portion of its closing.

Finally, it was not error to permit O'Callaghan to discuss the confidential Drug Enforcement Agency document found pursuant to a valid search of Robinson's South Michigan Avenue apartment. The document, as again pointed out by the government, was not offered for the truth of the information contained therein, but to show Robinson's connection to and state of mind regarding certain of his narcotics sources and El Rukn contacts.

Robinson has presented no justification for his motion for a new trial. Accordingly, his motion is denied.

## II. KNOX'S MOTIONS

### A. Motion to Arrest Judgment

Sammy Knox argues that the judgment against him ought to be arrested because he was never arraigned on the second superseding indictment.[20] Though Knox's counsel does his best to distinguish the seminal Supreme Court case on this issue, that case, *Garland v. Washington,* 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772 (1914), makes clear that "the want of formal arraignment [does not] deprive[ ] the accused of any substantial right, or in any wise change[ ] the course of trial to his disadvantage." *Id.* at 645, 34 S.Ct. at 457. This general rule is subject to exception only when the accused has had insufficient "notice of the accusation" and an inadequate "opportunity to defend himself in the prosecution." *Id.* Knox maintains that he went to trial lacking an understanding of the charges against him, that he might have pled guilty to the reduced charges of the second superseding indictment (and ought to at least have been afforded the

opportunity to do so), and that "his trial preparation suffered." The first and third parts of that argument may or may not be true, but the lack of formal arraignment on the second superseding indictment is unconnected to those assertions. As the government points out, Knox was arraigned on the original indictment; the superseding indictments actually reduced the number of charges (and did not substantively change the extant allegations) pursuant, at least in part, to our severance orders.

As to Knox's contention that, "[i]f given the opportunity, I would have seriously considered changing my plea in return for consideration by government or the Court," we are not surprised that a defendant who had just endured an unsuccessful four-month trial might, retrospectively, be loathe to subject himself to that experience again. In other words, Knox's guarded insinuation that he might have pled guilty to the second superseding indictment is not as powerful *ex post* as it might have been *ex ante.* This is particularly true where he did not object before trial that he had not been arraigned, see *Garland,* 232 U.S. at 644, 34 S.Ct. at 456, and where Knox faced the same potential penalties in the second superseding indictment as in the previous indictments. In short, Knox's motion to arrest judgment is denied, based on the principles announced almost eighty years ago in *Garland.*

### B. Motion for New Trial

As we noted in the context of Robinson's motion for a new trial, our power to grant or deny a motion for a new trial is discretionary, and will be overturned on appeal only if there has been " 'an error as a matter of law or a clear and manifest

---

**19.** We instructed the jury as follows upon their return:

THE COURT: It has been a long trial. Not surprisingly, at the end of a long trial where we all have been sitting here involved in this case for some time, tempers occasionally get a little high, and frustrations are felt by some of the parties involved in the trial.

I am going to instruct you not to hold any part of the incident that we had just before we took our recess against any of the defendants

or their lawyers. I want you to decide this case solely on the evidence and the facts that you have heard from the witness stand and disregard anything else, and, in particular, disregard the last incident.

The government may conclude.

Tr. at 8985.

**20.** Charles Green and Edgar Cooksey offer similar arguments in their motions to arrest judgment.

abuse of discretion.'" *Reed*, 875 F.2d at 113. To reiterate, our discretion has limits:

> The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.... The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.... Motions for new trial based on weight of the evidence are not favored. Court are to grant them sparingly and with caution, doing so only in those really "exceptional cases."

*Id.* (citations omitted).[21]

Knox urges us to reweigh the evidence with respect to his involvement in the narcotics conspiracy charged in Count III, the King Cobra murder conspiracy, the Patricia McKinley kidnapping (an issue we address in somewhat greater detail in the context of Knox's motion for acquittal, see *infra*), and the King Cobra/McKinley incidents as they related to bolstering Knox's position within the El Rukn hierarchy. We decline to do so. The evidence presented at trial to convict Knox makes it clear that permitting the jury's verdict to stand will not be a "miscarriage of justice."

In paragraph six of his new trial motion, Knox identifies ten additional grounds that he claims warrant a new trial. Subparagraphs A–F and H have either been previously addressed by this court or are insufficiently developed (*e.g.*, subparagraph E—"The court gave Government instructions over objection"). The other three contentions are equally meritless. Knox's claim that the extremely limited reference to the date of Gilbert Conner's death (Mother's Day) entitles him to a new trial is unjustified. Further, as the government notes, Knox did not object when the date was mentioned during the closing argument. Finally, the display of drug paraphernalia and other material seized during searches of El Rukn-controlled property was rele-

vant to the conspiracy charges, and was thus properly admitted.

Knox's motion for a new trial is denied.

**C. Motion for Judgment of Acquittal**

▮▮▮ Knox makes two arguments in connection with his acquittal motion. First, he contends that the evidence presented at trial was insufficient to convict him of the Patricia McKinley kidnapping. As the government notes, Knox's own admissions in connection with a state court intimidation charge arising from the same incident, coupled with the testimony of McKinley and Gip Duffy, are more than sufficient to support the kidnapping conviction here.

Second, Knox maintains that there was insufficient evidence to sustain his "conviction" regarding the Gregory Freeman murder. Evidently, the jury agreed, because Knox was acquitted of that charge, thereby mooting any motion for acquittal on that ground.

Knox's motion for acquittal is denied.

### III. CRAIG'S MOTION

▮▮ Andrew Craig's sole post-trial motion is for judgment of acquittal. As we noted above, the standard for review for this kind of motion is well-established:

> the test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government ... bear[ing] in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences."

*E.g.*, *Hagan*, 913 F.2d at 1281 (citations omitted); *see also Reis*, 906 F.2d at 291–92 (citations omitted); *Beck*, 615 F.2d at 447–48 (citations omitted).

---

21. Knox cites a 1980 Western District of Louisiana case for the standard of review on a motion for a new trial. *See United States v. Simms*, 508 F.Supp. 1188, 1202 (W.D.La.1980) (among other things, "court *may* weigh the evidence and con-

sider the credibility of the witnesses") (emphasis added). To the extent that this standard differs from that set forth by the Seventh Circuit, we, of course, will follow the Seventh Circuit.

Such a motion may be granted "only when the relevant evidence is insufficient to prove all the elements of the charged offense." *Beck*, 615 F.2d at 448. Evidence adduced at trial to establish guilt beyond a reasonable doubt is sufficient if *"any* rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *Colonia*, 870 F.2d at 1326 (emphasis added) (citations omitted). Put another way, a jury verdict may be overturned only "where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Bruun*, 809 F.2d at 408 (citations omitted).

Craig's argument with respect to his narcotics conspiracy and murder conspiracy convictions is essentially a witness credibility attack. Craig must thus shoulder a "very heavy burden" in the judgment of acquittal context. *Muskovsky*, 863 F.2d at 1322. This "heavier" burden stems from the axiom that, "absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge." *Kuzniar*, 881 F.2d at 470; *see also Muskovsky*, 863 F.2d at 1322.

To reiterate what we observed *supra*, an "extremely narrow" exception to this general rule permits the trial judge to make credibility determinations where the witness' testimony "contradicts indisputable physical facts or laws," where, in other words, the witness' story is impossible "in the sense that it would violate immutable laws of nature." *Kuzniar*, 881 F.2d at 470–71. Inconsistencies in a witness' testimony do not render that testimony "legally incredible." *Dunigan*, 884 F.2d at 1013. The witnesses Craig complains about, Derrick Kees and Detective David O'Callaghan, did not testify to things or events that would violate immutable laws of nature. Additionally, other witnesses tied Craig to the El Rukn narcotics enterprise, and to the murder conspiracies at issue here, witnesses like Harry Evans and Hen-

ry Harris. Neither of these men testified to anything that would contradict indisputable physical facts or laws, either. Accordingly, Craig's motion is denied.

## IV. GREEN'S MOTIONS

### A. Motion to Arrest Judgment

As discussed *supra*, a motion to arrest judgment because a defendant was not arraigned on a second superseding indictment must fail under *Garland v. Washington.* Charles Green's motion mimics Sammy Knox's on this point, and is denied for the same reasons. *See supra* § II(A).

### B. Motion for Judgment Notwithstanding the Verdict

■ Green contends that his convictions on Counts I–VI are based in full or in part on "the uncorroborated testimony of accomplice witnesses testifying in the hope and expectation of consideration and lenient treatment of their own horrifying crimes and lengthy criminal histories, and is untrustworthy and inadequate as a matter of law." We will not again belabor the point, but witness credibility issues will only rarely be overturned by the trial court; nothing in Green's motion identifies testimony at trial that is incredible as a matter of law. *See supra* §§ I(A)(1), III.

■ With respect to Count IV–VI, Green also contends that there was no evidence that he engaged in the various violent acts and conspiracies charged to "gain[ ] entrance to or maintain[ ] or increas[e] position" in the El Rukn enterprise, as required by 18 U.S.C. § 1959 (1988).[22] Rather, Green contends that, to the extent that these things transpired, his involvement was as a disinterested "loyal servant." The statute could not have been violated because, Green suggests, he "intended to advance the goals of the enterprise," and not his individual goals.

While that argument indicates an interesting approach to the statute, § 1959 is violated when a person "murders, kidnaps,

22. Both the government, in its second superseding indictment, and Green's attorney, in the motion for judgment notwithstanding the ver-

dict, refer to 18 U.S.C. § 1952B. That section was renumbered § 1959 in 1988.

maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do," for, among other reasons, "the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The government at trial presented evidence that committing violent acts was one way to move up the El Rukn ladder (and, conversely, demonstrating an aversion to such acts once in the gang was to invite trouble). This evidence was sufficient to enable the jury to conclude that Green acted to maintain his top level "general" rank when he ordered "Dog" Jackson's murder, "participated in the shooting of Theotis Clark, and conspired to murder" other King Cobra members. To the extent that Green's alternative explanation for his actions was presented at trial—and he does not advert to any specifics in his present motion, the jury rejected that interpretation.

Finally, with respect to Counts V and VI, Green argues that the government's witnesses told inconsistent stories about the Theotis Clark and "Dog" Jackson murders. Inconsistencies, however, do not render testimony "legally incredible." *Dunigan,* 884 F.2d at 1013; *see also Grandinetti,* 891 F.2d at 1307 (citing *Dunigan*).

■ Green also contends that his conviction on Count Fifty-Eight for unlawful possession of several firearms is not supported by the evidence. This is contrary to the record. Several witnesses testified that Green directed the Gorilla Family operations as an El Rukn general, and that he often held meetings in his third-floor apartment at the Morocco building. Sgt. Daniel Brannigan testified that, based on his longtime investigation of the El Rukns, the weapons seized were taken from Green's third-floor Morocco building apartment. Green, it appears, was in the apartment

when the weapons were seized. This is sufficient evidence for the jury to find Green guilty on Count Fifty–Eight, even though various other persons were present in the apartment at the time of the raid.[23]

We find no justification for Green's motion to arrest judgment, and therefore deny it.

### C. Motion for New Trial

Green maintains that "this court made erroneous rulings of law before and after trial which prejudiced Green at his jury trial and contributed unfairly and illegally to his convictions." As support, he offers fourteen assertions—many of which duplicate Sammy Knox's "paragraph six" contentions, and all of which are insufficiently developed to warrant any response beyond that already set forth in this opinion. Green's motion for a new trial is denied.

### V. COOKSEY'S MOTIONS

#### A. Motion for Judgment of Acquittal

■ Edgar Cooksey's motion for judgment of acquittal may be granted, as we have previously set forth in this opinion in the context of similar motions filed by Cooksey's co-defendants, "only when the relevant evidence is insufficient to prove all the elements of the charged offense." *Beck,* 615 F.2d at 448. Evidence adduced at trial to establish guilt beyond a reasonable doubt is sufficient if *"any* rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution." *Colonia,* 870 F.2d at 1326 (emphasis added) (citation omitted). Put another way, a jury verdict may be overturned only "where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Bruun,* 809 F.2d at 408 (citations omitted).

Cooksey's conviction for shooting Theotis Clark pursuant to an El Rukn plan to intimidate members of the King Cobras, as al-

---

**23.** Green's additional contention that the police lacked probable cause and a proper search war-

rant has already been considered and rejected.

leged in racketeering act 59 (Count I), is in fact supported by evidence adduced at trial by the government. Indeed, beyond the government's witnesses, Cooksey himself admitted at trial that he shot Clark. Tr. at 7701.[24] To the extent that Cooksey's argument is that the government did not prove that the shooting was related to the King Cobras and an El Rukn attempt to warn that rival gang that it should not sell heroin at a certain location, that argument must fail. While Cooksey might interpret the evidence differently than did the jury,[25] the government did present evidence that Clark was a member of the King Cobras and that the shooting was related to the narcotics competition between the King Cobras and the El Rukns. Cooksey cannot show that the testimony offered by the government's witnesses was legally incredible, as we have developed that standard *supra,* and we will not disturb the jury's credibility determinations without that showing.[26]

Cooksey's remaining arguments are also unavailing. He contends that the evidence at trial was insufficient to prove that he conspired to murder members of the King Cobras (racketeering act 19 and Count IV). As the government points out, its burden went no further than proving that Cooksey *conspired* to do the acts charged—that is, that he agreed with others to the commission of murder, that he did so with intent that murder be committed, and that, as the government emphasizes, "an act in furtherance of the agreement was performed by any party to the agreement." The government's evidence

was more than sufficient to prove this charge.

As to Count IV in particular, which adds to the King Cobra murder conspiracy allegations set forth in racketeering act 19 the provision that Cooksey undertook the activities in question as a means of maintaining or increasing his position in the El Rukn enterprise, there was ample evidence presented at trial to enable the jury to make a guilty determination. As we noted in the context of Charles Green's similar contentions, the jury heard testimony about the El Rukn power structure, and that testimony was sufficient to prove violation of 18 U.S.C. § 1959.[27] *See supra* § IV(B).

Cooksey's only argument in opposition to his conviction on racketeering act 31 and Count III is that the testimony of the government witnesses was "uncorroborated by any independent, reliable evidence." That argument, of course, is not enough to overturn the jury verdict insofar as that verdict was based on legally credible evidence. Additionally, as the government points out, other evidence tending to corroborate the testimony of Derrick Kees, Theotis Clark, and Henry Harris was presented.

The motion for judgment of acquittal is denied.

## B. Motion for New Trial

Cooksey makes three arguments. First, he contends that the government improperly introduced evidence at the trial pertaining to offenses held in abeyance pursuant to our severance opinions.

24. Cooksey's admission at trial ("Q: You shot Theotis Clark in the leg? A: Yes, I did.") makes his attorney's argument in the instant motion—namely, that "[t]he only direct evidence against Cooksey regarding the Clark shooting comes from Clark, Tredis Murray and Derrick Kees. . . . [T]hese sources [are] insufficient and unreliable to serve as a basis for a finding of guilty"—somewhat odd, to say the least.

25. Though not developed in the instant motion, at trial Cooksey testified that he shot Clark in connection with an illicit food stamp scheme. Cooksey told how he gave Clark $200 in food stamps, and how he expected Clark to give him $125 in cash in return. When Clark did not give him the money, Cooksey confronted Clark

and shot him in the leg. Tr. at 7696–7701. When asked directly by his attorney if the shooting had anything to do with drugs or the King Cobras, Cooksey said no. *Id.* at 7702.

26. Cooksey offers the witness credibility argument throughout the instant motion. We reject it for lack of a showing that the testimony in question was legally incredible.

27. Cooksey's similar argument in connection to *Count V* is also rejected. The jury's finding that Cooksey assaulted Theotis Clark for the purpose of maintaining and increasing his position in the enterprise is based on evidence presented at trial.

Second, he suggests that the government did not provide him with certain *Brady* material. Finally, he claims that we violated Federal Rule of Evidence 403 by admitting certain pieces of "prejudicial" evidence.

The government's response to the first contention is not entirely satisfactory. We specifically, and repeatedly, held in abeyance racketeering act 13, which charged Cooksey (and others) with (among other things) the murder of Charmaine Nathan. *See United States v. Andrews*, 754 F.Supp. 1197, 1202 n. 7 (N.D.Ill.1990) (*Andrews II*) (rejecting government's request that racketeering act 13 be tried at Trial I against Cooksey); *United States v. Andrews*, 754 F.Supp. 1206, 1210 (N.D.Ill.1990) (*Andrews III*) ("the matters held in abeyance, including Edward Cooksey's involvement in the Charmaine Nathan murder, shall remain in abeyance"); *United States v. Andrews*, 764 F.Supp. 1248, 1250 n. 1 (N.D.Ill.1991) (*Andrews V*) (rejecting government's suggestion that we " 'further reconsider' our rulings holding in abeyance the prosecution of Racketeering Act 13 against defendant Cooksey"). In fact, the government deleted Cooksey's name from racketeering act 13 in the second superseding indictment.

Thus, the government's discussion of the *Andrews III* Rule 403 issues is irrelevant to the matter of whether or not certain charges were held in abeyance. However, that discussion is relevant to the propriety of the limited evidence of the Nathan circumstances presented at trial, a distinction that Cooksey misses. There is no question that racketeering act 13 was held in abeyance. There is also no question that, subject to Rule 403 concerns, information about the Nathan murder was admissible to establish the RICO Count I pattern and continuity requirements. That evidence was so limited that it did not become inadmissible on Rule 403 grounds, and therefore Cooksey's motion for a new trial on this basis must fail.

As to the alleged *Brady* violations, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Cooksey's current argument parrots one he made earlier in the context of a motion to dismiss. We rejected his earlier motion, and reject the current version offered here. The new wrinkle is Cooksey's contention that there was a *Brady* violation because "it has been no secret to anyone involved in this case that [the Federal Defender's Office] is not a safe and secure depository of materials, which are of common interest to dozens of defense attorneys with unlimited and uncontrolled access." We do not find this unsupported claim persuasive.

Further, as the government points out, disclosure is required under *Brady* only of evidence that is both favorable to the defendant and material to either guilt or punishment. *E.g., United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (citing *Brady*). Cooksey does not recognize this duality in his motion, and cannot argue that the contested information—assuming *arguendo* that it was not properly or effectively disclosed by the government—was "material," that is, that had it been disclosed to the defense, "the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383. The contested information involved the Nathan murder charges, and, as we have pointed out, that charge was held in abeyance. Therefore, there is no way that Cooksey can claim the outcome regarding the Nathan charges would have been different had the government disclosed to him the information he claims is favorable to his case. Moreover, there being no substantive charge regarding Nathan against Cooksey at Trial I, there can be no way that he was found guilty of substantive racketeering based on the Nathan charges. The jury, in fact, convicted Cooksey on Count II based on his involvement in the El Rukn narcotics conspiracy and the King Cobra murder conspiracies. Accordingly, Cooksey's *Brady* argument is rejected.

Finally, Cooksey claims that we violated Rule 403 in allowing the government to display drug paraphernalia and assorted other "prejudicial" pieces of evidence. As with Sammy Knox's similar argument, see *supra* § II(B), this evidence was relevant to the conspiracy charges in Count I.

Cooksey's motion for a new trial is denied.

### C. Motion to Arrest Judgment

██ The one argument we need consider in some detail in Cooksey's motion to arrest judgment is the contention that racketeering act 19 fails to enumerate a specific overt act as opposed to merely pleading general statutory language. Racketeering act 19 alleges that Cooksey and others "did knowingly and intentionally conspire and agree to kill and cause to be killed, and attempt to kill" various King Cobra gang members, "and did an overt act in furtherance thereof, in violation of Illinois Revised Statutes, Chapter 38, Sections 8–2 and 9–1." Second Superseding Indictment at 56.

The case Cooksey cites in support of his argument makes clear that the government adequately phrased racketeering act 19. The Illinois Appellate Court noted that

> [t]he essence of conspiracy is an agreement to commit a crime and the offense is complete when the agreement is made, even though no act is done to carry it into effect. [Citation omitted.] The purpose of setting forth a specific overt act in the indictment, as against merely pleading the general language of the statute, is to sufficiently inform the accused of the nature of the charge in order to prepare their defense and to serve as a bar to future prosecutions for the same offense. [Citations omitted.]

*People v. Jayne*, 52 Ill.App.3d 990, 1004, 10 Ill.Dec. 827, 837, 368 N.E.2d 422, 432 (1st Dist.1977). Racketeering act 19 satisfies Illinois law by alleging an agreement to conspire to commit a crime. As the court in *Jayne* noted, "the offense is complete when the agreement is made." *Id.* Moreover, Cooksey does not allege that he was not sufficiently informed about the nature of the conspiracy charged, or that he is subject to future prosecution for the same offense. Indeed, as the government notes, racketeering acts 20–22 "clearly constitute overt acts in furtherance of the conspiracy charged in [racketeering act] 19." Thus, we find no reason to grant Cooksey's· motion to arrest judgment on this basis.

As to Cooksey's claim that he was not arraigned on the second superseding indictment, we have covered this ground in the context of similar arguments by Sammy Knox and Charles Green. *See supra* §§ II(A), IV(A). We deny Cooksey's argument for the reasons set forth above.

Cooksey's motion to arrest judgment is denied.

### VI.  BOYD'S MOTION

██ Jeff Boyd's motion for judgment of acquittal seeks acquittal on Counts I–IV, VII, and X "because of a lack of sufficiency of evidence to sustain convictions thereon." This motion is literally one sentence in length, and (obviously) does not detail the alleged insufficiencies. Suffice it to say that there was sufficient "evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt." *Hagan*, 913 F.2d at 1281. The racketeering conspiracy, racketeering, narcotics conspiracy, King Cobra murder conspiracies, and Patricia McKinley kidnapping charges were all supported by sufficient evidence, as detailed more extensively in the government's response to Boyd's motion. Boyd does not suggest why the evidence was insufficient, and we therefore deny his motion for acquittal.

### VII.  CONCLUSION

All of the post-trial motions filed by Trial I defendants—Noah Robinson, Sammy Knox, Andrew Craig, Charles Green, Edgar Cooksey, and Jeff Boyd—are denied for the reasons set forth above.[28] It is so ordered.

---

**28.** Any argument in these motions not explicitly    addressed in this opinion has also been rejected.